**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MICHAEL RAY HOGAN,

*Petitioner-Appellant*,

v.

JEREMY BEAN; ATTORNEY GENERAL FOR THE STATE OF NEVADA,

*Respondents-Appellees*.

No.18-99004

D.C. No.
2:97-cv-00927-
JCM-PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted February 17, 2023
San Francisco, California

Filed June 4, 2025

Before: Marsha S. Berzon, Jay S. Bybee, and Consuelo M.
Callahan, Circuit Judges.

Opinion by Judge Bybee;
Partial Concurrence and Partial Dissent by Judge Callahan

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed in part and reversed in part the district court's denial of death row inmate Michael Hogan's petition for a writ of habeas corpus, and remanded in part, in an appeal in which Hogan challenged the district court's denial of relief on two certified issues and moved to expand the certificate of appealability (COA) on five issues.

The case predates the effective date of the Antiterrorism and Effective Death Penalty Act of 1996.

In the first certified claim (Claim 2(H)), Hogan alleged ineffective assistance of counsel (IAC) based on trial counsel's failure to adequately investigate the legality and underlying facts of his 1971 Iowa manslaughter conviction, which Nevada used as an aggravating circumstance in his penalty proceeding. Affirming the district court's resolution of this claim, the panel held that trial counsel's decision to focus on the Nevada challenge rather than a potential out-of-jurisdiction challenge in the court of origin was a reasonable strategic decision, and that Hogan cannot demonstrate ineffective assistance for counsel's failure to challenge the Iowa conviction as a crime-of-violence aggravator under Nevada law.

In the second certified claim, Hogan asserts that the procedural default of his trial-court IAC claims (Claims 2(A)-(G) and (I)-(O)) should be excused under *Martinez v.*

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*Ryan*, 56 U.S. 1 (2012). The panel disagreed with both of the district court's reasons for concluding that Hogan failed to establish "cause" under *Martinez*. The panel disagreed that *Martinez* categorically does not apply when the procedural default is based on a state timeliness rule rather than a state prohibition on successive petitions. The panel also disagreed that Hogan's failure to raise the trial IAC claims in his second petition means that any ineffectiveness of his initial-review post-conviction relief (PCR) counsel cannot constitute "cause" for the procedural default. The panel held that the district court erred in reading "cause" to demand a showing, akin to the proximate cause required applied in the realm of torts, of a causal connection between one default and the state court's refusal later to hear successive petitions. Here, the failure of Hogan's first PCR counsel to raise the relevant trial IAC claims impeded Hogan's efforts to comply with Nevada's procedural rule that all postconviction claims must be brought in the first PCR petition. That failure also impeded Hogan's ability to file a timely petition raising the trial IAC claims. The panel thus concluded that *Martinez* relief may be available to Hogan and that Claims 2(A)-(G) and (I)-(O) should be remanded to the district court for further proceedings. The panel set forth guidance for how the district court should proceed on remand to determine whether it is appropriate to reach the merits of those claims.

The panel granted Hogan's motion to expand the COA as to one issue: whether the district court erred in dismissing as procedurally defaulted his challenges to the aggravating circumstances (Claims 5(A) and (B)). The panel held that Claims 5(A) and (B) were properly exhausted. The panel also held that because Nevada's procedural rules were not consistently applied as of 1990, and so could not constitute

an adequate state ground, any procedural default in 1993 does not bar this court's review of the merits. Addressing the merits, the panel (1) held that Hogan's direct challenge to the Iowa conviction is not cognizable; (2) could discern no evidence that the Nevada Supreme Court's analysis—in rejecting Hogan's argument that he did not knowingly create a great risk of death to more than one person, as required under NRS § 200.033(3)— sought to avoid federal review; and (3) rejected Hogan's challenge to this aggravating circumstance as unconstitutionally vague.

The panel declined to expand the COA to cover four other issues.

Judge Callahan concurred in part and dissented in part. She dissented from the opinion's assertion that Hogan's failure to allege ineffective assistance of trial counsel until his third state PCR petition may be excused under *Martinez*. She wrote that the narrow exception set forth in *Martinez* only excuses a procedural default based on the alleged IAC of post-conviction counsel in a defendant's *initial* state PCR proceeding. The *Martinez* exception to the general rule that a prisoner does not have a constitutional right to counsel in state postconviction proceedings does not cover Hogan's case—or any case—where trial counsel IAC is not raised until a third or subsequent state PCR proceeding.

## COUNSEL

Robert Fitzgerald and Brad D. Levenson, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Federal Public Defender for the District of Nevada, Las Vegas, Nevada; for Petitioner-Appellant.

Matthew S. Johnson (argued), Deputy Attorney General, Nevada Office of the Attorney General, Carson City, Nevada; Erica Berrett and Michael Bongard, Deputy Attorneys General; Jessica E. Perlick, Senior Deputy Attorney General; Aaron D. Ford, Attorney General; Nevada Office of the Attorney General, Las Vegas, Nevada; for Respondents-Appellees.

## OPINION

BYBEE, Circuit Judge:

Michael Hogan, an inmate incarcerated on death row in Nevada, appeals the denial of his petition for a writ of habeas corpus. He challenges the district court's denial of habeas relief on two certified issues and moves to expand the certificate of appealability ("COA") on four issues. We grant the motion to expand the COA as to one issue. We affirm the district court's judgment in part, and reverse and remand in part.[1]

---

[1] Hogan has filed two requests for judicial notice. ECF No. 18, 76. We grant the request as to the March 21, 1985, memorandum regarding Dr. Green, ECF No. 18 at 540, as well as the filings in *Johnson v. Mississippi*, 486 U.S. 578 (1988), ECF No. 75. We deny the remaining

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts and proceedings of this case span almost forty years—more than fifty years when we consider Hogan's challenges to the aggravating circumstances that resulted in a Nevada jury imposing the death penalty. *See* Appendix A (providing a procedural timeline). Hogan's direct appeal in the case was completed in 1987. *Hogan v. State*, 732 P.2d 422 (Nev. 1987) (per curiam) (*Hogan I*), *cert. denied*, 484 U.S. 872 (1987). Since that time, Hogan has filed four separate petitions for postconviction relief in Nevada (state postconviction petitions) between 1987 and 2008, four amended petitions for habeas corpus in U.S. District Court in Nevada (federal habeas petitions) between 1989 and 2012, and a petition for postconviction relief in Iowa, an appeal to the Iowa Supreme Court, followed by a petition to the U.S. District Court in Iowa, and an appeal to the Eighth Circuit. *See* Appendix B (providing a list of claims raised by Hogan in various petitions). We outline the facts and proceedings below and add detail to those facts as necessary to explain our analysis.

### A. *Guilt and Penalty Proceedings for the Murder of Heidi Hinkley*

In May 1985, a jury convicted Hogan of first-degree murder for the killing of his girlfriend, Heidi Hinkley, and the attempted murder of Hinkley's teenage daughter, Shelley Brown. *Hogan I*, 732 P.2d at 423.

---

requests given our disposition. *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (declining to take judicial notice where the documents were "not relevant to the resolution of th[e] appeal").

In November 1984, Hogan and Hinkley traveled from Nevada to California to attend a social event with the Deutsch American Society of Southern Nevada.  They argued on the drive down and throughout the event.  Helga Schneider, who traveled with them, testified that the morning after the event, Hinkley showed Schneider bruises on her legs and told Schneider that Hogan had inflicted them. On the way back to Las Vegas, Hinkley and Hogan continued to argue.  Hinkley told Hogan that their relationship was over.  Multiple witnesses overheard Hogan repeatedly threaten to kill Hinkley when the couple returned home.

On November 18, 1984, Hogan and Hinkley returned to their home around 10:00 p.m.  Some neighbors then came over to drink alcohol and use cocaine and marijuana. Around 3:00 a.m., Hinkley woke up her daughter, Brown. Brown described Hinkley as "crying" and "shaking all over."  Hinkley told Brown that Hogan had just threatened to kill her.  Hinkley and Brown fled to their friend Elaine Lundmark's house, scared and crying.  Hinkley told Lundmark that Hogan had pulled out a gun and said he was going to kill her.

The next morning, November 19, 1984, at about 5:00 a.m., Hinkley and Brown returned home, went into Brown's bedroom together, and locked the door.  Later that afternoon, Hogan knocked on Brown's bedroom door asking to speak with Hinkley.  The three of them went into the living room, but once Hinkley told Hogan that he had to leave, Brown retreated to the bathroom.  Brown then heard a gunshot and heard Hinkley tell her to run.

Before Brown could leave, Hogan appeared at the bathroom door with a gun and shot her three times, striking

her in the hand, arm, and chest.  As Brown called the police, Hogan shot her again.  He yanked the phone out of the wall socket and then fired a final shot at close range, striking Brown in the head.  When Brown thought she heard Hogan getting into his car, she ran outside for help.  Officers arrived and arrested Hogan before he could drive away.

At trial, the defense argued that Hogan was guilty of second-degree murder of Hinkley, as opposed to first-degree murder as charged, because he did not premeditate or deliberate before committing the crimes.  Hogan testified in his own defense.  Hogan said that he did not remember shooting Hinkley or Brown, and he denied ever threatening Hinkley.  Hogan relayed that his arguments with Hinkley were caused by her attempts to make him jealous of other men.  He drank alcohol on their return trip from California, continued to drink when their friends came over, and used cocaine with them.  He remembered knocking on Brown's door later in the afternoon to look for Hinkley.  He also remembered Hinkley telling him that she had wanted to take another man home with her, and he remembered lying on the ground being arrested.

The jury found Hogan guilty of the first-degree murder of Hinkley and the attempted murder of Brown.

At the penalty phase of Hogan's trial, the State sought the death penalty, alleging two aggravating circumstances. First, the State alleged that Hogan was previously convicted of a felony involving violence to the person of another under NRS § 200.033(2).  In support of this aggravating circumstance, the State proffered evidence that in 1971, Hogan pleaded guilty to and was convicted of manslaughter in Iowa.  Second, the State alleged that Hogan had "knowingly created a great risk of death to more than one

person by means of a . . . course of action which would normally be hazardous to the lives of more than one person" under NRS § 200.033(3). During these proceedings, Hogan was represented by George Franzen and Marcus Cooper from the Clark County Public Defender's Office. Counsel challenged both aggravators and repeatedly sought continuances to, in particular, investigate the circumstances of the Iowa conviction.

The jury found the aggravating circumstances, could not find mitigating circumstances, and returned a verdict for death. In 1987, Hogan appealed his conviction and sentence to the Nevada Supreme Court, which affirmed, and the Supreme Court denied review. *Hogan I*, 732 P.2d 422 (1987), *cert. denied*, 484 U.S. 872 (1987). In its decision, the Nevada Supreme Court observed:

> This was a premeditated murder with no clear motive, followed by a brutal attempt to kill the only apparent witness to the crime. This is the second time Hogan has killed a woman with whom he was involved, and we are cognizant of the fact that Hogan's repeated shooting of Ms. Hinkley's daughter ended with a shot to the head of a helpless girl after a pause for observation.

*Id.* at 425.

B. *Hogan's Four State Postconviction Petitions and First Three Amended Federal Petitions for a Writ of Habeas Corpus*

In November 1987, Hogan filed pro se his first state postconviction petition. *See* NRS § 177. Hogan raised four

claims, including that he had been denied effective assistance of trial and appellate counsel, and flagged the use of his Iowa conviction at the penalty phase. He was appointed counsel, Christopher Maglaras, Jr., who filed an eight-page memorandum of points and authorities, alleging ineffective assistance of counsel ("IAC") based on trial counsel's inadequate investigation of the Iowa conviction, his trial counsel's assertions that he was unprepared to proceed to trial, and the delay in obtaining a psychiatric report until after trial began. The memorandum also requested an evidentiary hearing. The Nevada district court dismissed the petition because it "consisted of bare or naked claims for relief unsupported by any specific factual basis which would entitle [Hogan] to relief." The state court further found that at Hogan's trial "the Court observed, and the record of these proceedings reflects, a high degree of preparation by defense counsel," and that the defense was "vigorous and capable" and "did not fall below an objective standard of professional reasonableness."

At Hogan's instruction, Maglaras filed a motion to withdraw as counsel in April 1988, because Hogan wanted to raise Maglaras's own ineffectiveness in the post-conviction proceedings. Maglaras's motion to withdraw was denied. In July 1988, Hogan filed an opening brief in the Nevada Supreme Court, raising the same issues surrounding trial counsel's failure to investigate Hogan's Iowa conviction and failure to obtain the psychiatric report until after trial began. The Nevada Supreme Court dismissed, based on the "conclusory nature" of claims in the petition. Order Dismissing Appeal, *Hogan v. State*, 809 P.2d 607 (Table), No. 18994, at *1 (Nev. Dec. 21, 1988) (*Hogan II*). The court concluded that the district court had not erred in refusing to conduct an evidentiary hearing. Citing

*Strickland v. Washington*, 466 U.S. 558 (1984), the Nevada Supreme Court concluded that Hogan had "received effective assistance at his trial and in his direct appeal." *Hogan II*, No. 18994, at *1.

In January 1989, Hogan filed a pro se petition for a writ of habeas corpus with the United States District Court for the District of Nevada, and was appointed new counsel. The Federal Public Defender's Office was briefly appointed, but was later replaced by private counsel, Annette Quintana and William Smith. With Quintana and Smith as counsel, Hogan filed first and second amended petitions in federal court. Because Hogan's habeas petition contained exhausted and unexhausted claims, in September 1990, the federal district court granted Hogan a stay of proceedings so that he could return to state court to exhaust all of his claims.

Hogan then filed a second state postconviction petition in Nevada in November 1990. *See* NRS § 34.360 *et seq.* Hogan raised four grounds: (1) ineffective assistance of trial counsel for failure to ascertain whether Hogan's Iowa conviction was invalid; (2) ineffective assistance of trial counsel for failing to attack the Iowa conviction in an Iowa postconviction proceeding; (3) ineffective assistance of trial counsel for failure to investigate and ascertain whether Hogan's conduct involved an act of intentional violence or threat of violence; and (4) actual innocence of the aggravating circumstance proscribed in NRS § 200.033(2). The state district court dismissed the petition on the grounds of procedural default and law of the case. The Nevada Supreme Court affirmed, concluding that Hogan's petition did not meet the "exceptional provisions" for overcoming the procedural bar of NRS § 34.810 on successive petitions. *Hogan v. Warden, Ely State Prison*, 860 P.2d 710, 715 (Nev. 1993) (*Hogan III*), *on motion for reh'g*, 916 P.2d 805 (Nev.

1996) (*Hogan IV*), *cert. denied*, 519 U.S. 944 (1996).  The
Court reviewed both aggravating circumstances on the
merits, as it had on direct review, and concluded that Hogan
could not avoid the procedural bar by claiming actual
innocence of the aggravating circumstances.  *Id.* at 715–16.
The Nevada Supreme Court affirmed the district court's
judgment that Hogan's second state postconviction petition
"constituted an abuse of the writ." *Id.* at 716.  And the Court
also reiterated that it "previously determined, and it is now
the law of the case, that Hogan's trial and appellate counsel
were clearly effective" under *Strickland*. *Id.*[2]

In 1997, the U.S. District Court for the District of
Nevada reopened Hogan's federal habeas proceedings.  Four
years later, in 2001, now represented by new counsel, Glynn
Cartledge and Richard Cornell, Hogan filed a third amended
federal habeas petition.  In this amended petition, Hogan
raised twenty-seven claims, including eleven new claims of
ineffective assistance of trial counsel and one claim of
ineffective assistance of appellate counsel.[3]  The court again

---

[2] The final disposition of Hogan's second state postconviction petition
was complicated by internecine warfare on the Nevada Supreme Court
on an issue that had little to do with Hogan.  The Nevada Supreme Court
was embroiled in a titanic struggle over alleged improprieties by a justice
on the court.  *See Whitehead v. Comm'n on Jud. Discipline*, 873 P.2d
946 (Nev. 1994).  Shortly after the Court decided *Hogan III*, 860 P.2d
710, newly appointed counsel for Hogan filed a petition for rehearing to
ask the justice to disqualify himself.  The proceedings resulted in *Hogan
IV*, 916 P.2d 805, and a denied petition for certiorari, 519 U.S. 944
(1996).  *Hogan IV* did not address the merits of any of Hogan's habeas
claims.

[3] Hogan's claims of trial IAC included Ground 3 (failing to pursue
forensic evidence of the murder weapon); Ground 9 (presenting harmful
expert testimony); Ground 10 (failure to object to hearsay testimony);

stayed the proceedings in December 2003 so that Hogan could exhaust his new claims in state court.

With a stay in place, in February 2004, Hogan filed his third state postconviction petition, raising claims identical to those in his third amended federal habeas petition. In August 2004, the state court conducted an evidentiary hearing on the single issue of Hogan's claim of trial IAC for presenting harmful expert testimony from Dr. O'Gorman, a psychiatrist. The court denied the petition in November 2005. Hogan appealed, and the Nevada Supreme Court affirmed, concluding that Hogan's petition was successive under NRS § 34.810 and untimely under NRS § 34.726, and that he had not shown good cause and prejudice. Order of Affirmance, *Hogan v. State*, 178 P.3d 764 (Table), No. 46293, at *1–6 (Nev. Nov. 15, 2006) (*Hogan V*).

In 2008, Cartledge and Cornell withdrew as counsel, and the Federal Public Defender's Office was appointed for the second time. Hogan requested another stay of federal proceedings in order to present yet more claims to the Nevada courts.

---

Ground 11 (constructive IAC for court's failure to grant counsel's motion for continuance); Ground 12 (constructive IAC for court's failure to grant counsel's motion for substitution of counsel); Ground 13A (failure to object to jury instructions concerning premeditation and deliberation); Ground 14 (use of "great risk of death" aggravator); Ground 18 (failure to mention executive clemency); Ground 21 (failure to present potential mitigation defense); Ground 24 (failure to challenge Iowa plea as knowing and voluntary); and Ground 26 (failure to present all relevant evidence, including 28 sub-claims). Ground 27 alleged ineffective assistance of appellate counsel, including 26 subclaims. The majority of these subclaims addressed failure to raise specific claims before the Nevada Supreme Court.

In September 2008, Hogan filed his fourth and final state postconviction petition. This fourth state petition raised thirty-eight claims, many with subclaims, including fourteen ineffective assistance of trial counsel subclaims. The Nevada district court dismissed in 2009, and the Nevada Supreme Court affirmed in 2012, again ruling the petition was successive and untimely. Order of Affirmance, *Hogan v. State*, No. 54011, 2012 WL 204641, at *1 (Nev. Jan. 20, 2012) (*Hogan VI*);

C. *Hogan's Fourth Amended Federal Habeas Petition*

Following the Nevada Supreme Court's decision in *Hogan VI*, Hogan filed a motion to lift the stay, and the U.S. District Court for the District of Nevada reopened federal proceedings. In October 2012, Hogan filed his fourth and final amended federal habeas petition. In his operative petition, Hogan alleged twenty-seven claims, many with extensive subclaims, including fifteen ineffective assistance of trial counsel subclaims. The claims were substantively similar to the claims raised in Hogan's fourth state postconviction petition but were numbered and categorized in slightly different ways.

In March 2014, the federal district court dismissed the bulk of Hogan's claims as procedurally defaulted under NRS § 34.726, which generally bars claims filed later than one year after a conviction becomes final under state law. However, the district court found that four claims—Claims 2(H), 10, 11(C) and (D), and 26—were not procedurally defaulted. Four years later, in March 2018, the district court ruled on the merits of the four remaining claims.

First, in Claim 2(H), Hogan asserted that his trial counsel was ineffective for failing to challenge the validity of his Iowa conviction for manslaughter. That conviction served

as an aggravating factor supporting Hogan's capital conviction. Although the district court initially granted Hogan's motion for an evidentiary hearing on Claim 2(H), the district court ultimately denied Hogan's petition without holding the hearing. The district court held that Hogan had not shown his counsel performed below the "prevailing professional norms" under *Strickland* for failing to adequately challenge the Iowa guilty plea as invalid under Iowa law. The district court also held that Hogan had not shown he suffered prejudice for his counsel's failure to challenge the use of his Iowa conviction as a felony involving violence, thus qualifying as an aggravating circumstance under NRS § 200.033(2). Second, in Claim 10, Hogan alleged that the trial court violated his confrontation rights because it allowed the jury to consider hearsay testimony from murder victim Hinkley and Dr. Green, the Nevada coroner, who had undergone heart surgery. The district court found that the out-of-court statements were admissible, and that even if there was a Confrontation Clause violation, Hogan failed to show it affected the outcome of his trial. Third, in Claim 11, Hogan alleged that various instructional errors violated Hogan's constitutional rights because they misinformed jurors, minimized the State's burden of proof, and did not protect against arbitrary and capricious infliction of the death penalty. The court considered two instructions: Hogan first alleged in Claim 11(C) that an anti-sympathy instruction negated the constitutional mandate that all mitigating evidence be considered. And in Claim 11(D) Hogan challenged the trial court's refusal to provide an instruction regarding the lack of general deterrent effect of capital punishment on future crime. The district court found that because the Nevada Supreme Court rejected Hogan's claims

and there was no persuasive authority to the contrary, Claims 11(C) and (D) were without merit. Fourth, in Claim 26, Hogan alleged that he was entitled to habeas relief based on the cumulative effect of the constitutional violations alleged in his fourth amended habeas petition. The district court denied this claim on the merits, finding that Hogan failed to demonstrate that multiple constitutional errors prejudiced the outcome of his state criminal proceeding. Accordingly, the district court denied Hogan's fourth amended federal habeas petition. Hogan filed a motion to alter or amend the judgment, and the district court denied it. This appeal followed.

## II.  SCOPE AND STANDARD OF REVIEW

### A.  *Scope of Our Review*

Hogan has briefed six issues, only two of which were certified for appeal by the district court: (1) "[w]hether petitioner's constitutional right to effective assistance of counsel was violated because trial counsel failed to adequately investigate the legality and underlying factual circumstances of [Hogan's] Iowa manslaughter conviction that the State used as an aggravating circumstance" (Claim 2(H)); and (2) "[w]hether the procedural default of Hogan's ineffective assistance of trial counsel claims [Claim 2] should be excused under *Martinez v. Ryan*, 56 U.S. 1 (2012)." We address his certified claims in Part III.

We may not review Hogan's uncertified claims unless we grant a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A) ("Unless a . . . judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding . . . ."). We will treat Hogan's briefing of his uncertified issues as an application for a COA. Fed. R. App.

P. 22(b)(1)–(2); Ninth Cir. R. 22–1(e); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *McGill v. Shinn*, 16 F.4th 666, 678 (9th Cir. 2021). Section 2253(c)(2) provides that we may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." Section 2253(c) applies whether the habeas petition was filed before or after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Slack*, 529 U.S. at 478. Hogan's uncertified issues are: (1) whether Hogan has procedurally defaulted his challenge to the constitutionality of the two aggravating factors supporting his death sentence (Claims 5(A) and (B)); (2) whether the trial court violated Hogan's confrontation right (Claim 10); (3) whether jury instructional errors prevented the jury from crediting mitigation evidence and providing Hogan with an individualized sentencing determination (Claims 11(C) and (D)); and (4) whether Hogan's lethal injection claim is procedurally defaulted (Claim 25). For reasons we will explain in Part IV, we deny a COA as to Hogan's Claims 10, 11(C) and (D), and 25. We grant a COA as to Claims 5(A) and (B), although we affirm on the merits.

B. *Standard of Review*

We have jurisdiction under 28 U.S.C. § 2253. We review the district court's denial of a habeas petition de novo and its factual findings for clear error. *Robinson v. Schriro*, 595 F.3d 1086, 1099 (9th Cir. 2010). We also review de novo the district court's conclusion that a claim is procedurally defaulted. *Cooper v. Neven*, 641 F.3d 322, 326 (9th Cir. 2011). "We may affirm the district court's decision on any ground supported by the record, even if it differs from the district court's rationale." *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004).

This case predates AEDPA's effective date. Under pre-AEDPA law, we review a state court's determination of questions of federal law and mixed questions of law and fact de novo. *Summerlin v. Schriro*, 427 F.3d 623, 628 (9th Cir. 2005). With respect to matters of Nevada law, the "'state courts are the ultimate expositors of state law,' and we are bound by the state's construction except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue." *Peltier v. Wright*, 15 F.3d 860, 862 (9th Cir. 1994) (quoting *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)). We "accord a presumption of correctness to state-court findings of fact" unless "the state-court finding of fact is not fairly supported by the record" or comes within one of seven factors provided in the pre-AEDPA version of 28 U.S.C. § 2254(d).[4] *Sumner v. Mata*,

---

[4] 28 U.S.C. § 2254(d) (1991) formerly provided:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;
(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

455 U.S. 591, 592 (1982) (per curiam) (internal quotation marks and citation omitted); *see Burton v. Davis*, 816 F.3d 1132, 1140 (9th Cir. 2016).

## III.  CERTIFIED ISSUES

A. *Certified Claim 1: Did Trial Counsel in the Nevada Proceedings Provide Ineffective Assistance by Failing to Adequately Investigate and Challenge Hogan's 1971 Iowa Manslaughter Conviction (Claim 2(H))?*

Hogan alleges that his trial counsel provided ineffective assistance by failing to adequately investigate the legality and underlying facts of his 1971 Iowa manslaughter conviction.  Nevada used Hogan's Iowa conviction as an aggravating circumstance in his penalty proceeding.

### 1.  Iowa proceedings

The underlying facts of Hogan's manslaughter conviction concern the death of Savilla Kubicek, Hogan's former girlfriend.  In 1970, Hogan and Kubicek had an argument in the parking lot of a bar.  A witness described a physical altercation, in which Hogan choked Kubicek and slammed her head into the side of his car.  Kubicek crumpled to the ground and appeared unconscious.  Hogan picked her up and put her in the car.  Once Kubichek regained consciousness, Hogan got back into the car and drove away.

Later that evening, Hogan was seen driving with Kubicek in the passenger seat.  Witnesses saw the passenger door of the car open and Kubicek's body fall out and roll to the shoulder of the road; Hogan did not stop driving.  Kubicek was still breathing after the fall, and witnesses called an ambulance, but she died as a result of the injuries sustained that night.  It was never clear whether Kubicek jumped or was pushed from the car.  Hogan was initially

charged with murder, but pleaded guilty to a reduced charge of manslaughter and was sentenced to eight years in state prison. He filed no appeals or postconviction petitions and was released in 1972 and completed probation in 1974.

## 2. Nevada proceedings

One week before Hogan's Nevada trial was scheduled to begin on February 19, 1985, the State filed a formal notice seeking the death penalty. As one of its two alleged aggravating circumstances, the State identified the Iowa conviction to support its contention that Hogan was "a person who . . . has been convicted of . . . [a] felony involving the use or threat of violence to the person of another." NRS § 200.033(2).

The day after the State filed its notice, Hogan's attorney, George Franzen of the Clark County Public Defender's Office, moved to continue the trial. The court granted the motion and rescheduled the trial for the end of April 1985. During these two months, Marcus Cooper, also from the Clark County Public Defender's Office, replaced Franzen as lead counsel. Cooper had previously participated in one capital case and, in his own words, had received "no training in [capital] cases." Cooper moved for a second and third continuance, which pushed the trial date to May 6, 1985. The last motion to continue, filed April 29, 1985, specifically mentioned that counsel was "in the process of trying to contact and interview defense witnesses in the State of Iowa" to challenge the aggravating circumstance regarding a prior conviction.

A week before Hogan's trial was set to begin, Cooper filed a fourth motion to continue. Cooper informed the court he had been working with the public defender's office in Iowa, and that he needed more time for the investigation.

Cooper requested two months to defend against the prior felony aggravator.  The court granted two days.

On the eve of trial, Hogan's counsel renewed his motion to continue, asserting he was unprepared for trial and that "effective representation" required him to conduct a "thorough investigation of [Hogan's] prior conviction." Hogan's counsel explained "[t]hat the Clark County Public Defender's Office ha[d] neither the time [n]or resources to independently investigate [the Iowa] conviction," and he was relying "solely" on the Black Hawk County Public Defender's Office in Iowa to investigate the prior crime. Hogan's counsel also informed the court that he had been "extremely ill" for three weeks of the two months he had been on the case.  The court denied the motion and proceeded to empanel a jury.

Hogan was convicted in May 1985.  Hogan's counsel moved to continue the penalty hearing, but the court denied the motion.  The day before the penalty hearing, Hogan's counsel moved to strike the prior-violent-felony aggravating circumstance, alleging that Hogan's Iowa plea was constitutionally defective because it was not entered "voluntarily and understandingly," in violation of the U.S. Constitution.  *See Boykin v. Alabama*, 395 U.S. 238, 244 (1969).  Accordingly, it could not be admitted in Nevada courts.  *See* NRS § 175.552(3) ("No evidence which was secured in violation of the Constitution of the United States or the Constitution of the State of Nevada may be introduced."); *Ridings v. State*, 669 P.2d 718, 719 (Nev. 1983), *overruled on other grounds by Bryant v. State*, 721 P.2d 364, 368 n.3 (Nev. 1986); *Standen v. State*, 657 P.2d 1159, 1160–62 (Nev. 1983); *Scott v. State*, 630 P.2d 257, 258 (Nev. 1981).  The trial court found that Hogan's Iowa plea

was not constitutionally defective and denied the motion to strike. The jury returned a verdict for death.

### 3. Postconviction proceedings

In March 1989, during the pendency of Hogan's first federal habeas proceeding, Hogan filed a petition in Iowa district court challenging his Iowa conviction on the ground that he had not voluntarily pleaded guilty because the Iowa trial court had failed to inquire whether there was adequate basis for the charge. *See State v. Finney*, 834 N.W.2d 46, 55–56 (Iowa 2013) (explaining the standard); *State v. Sisco*, 169 N.W.2d 542, 545–48 (Iowa 1969) (adopting the standard). The State of Iowa indicated that it would stipulate that Hogan's manslaughter plea violated Iowa law. Still, the Iowa court denied Hogan's challenge as untimely because Hogan failed to file it prior to the statutory deadline of June 30, 1987. The Iowa Supreme Court affirmed. *Hogan v. State*, 454 N.W.2d 360 (Iowa 1990); *see* Iowa Code § 663A.3. Hogan's efforts to challenge the conviction in both the United States District Court for the Northern District of Iowa and the United States Court of Appeals for the Eighth Circuit also failed. *See Hogan v. Iowa*, 952 F.2d 224 (8th Cir. 1991) (per curiam).

After challenging his Iowa conviction in the Iowa state and federal courts, Hogan then raised his challenges to the Iowa conviction again in Nevada state court. The Nevada Supreme Court reviewed the proceedings in the Iowa courts and concluded that the Iowa Supreme Court had "found no factual basis for relieving Hogan of his felony conviction for manslaughter and there is no basis for presuming that the Iowa court ignored constitutional grounds for granting such relief." *Hogan III*, 860 P.2d at 713. The Court also reviewed the extensive colloquy between Hogan and the Iowa trial

judge in 1971 and rejected Hogan's argument that "irrespective of the constitutionality of his Iowa conviction, there was no evidentiary basis for finding that his crime involved the use or threat of violence on [Kubicek]." *Id.* (quoting the plea colloquy); *see also id.* at 713 n.1 (citing *Hogan I*, 732 P.2d at 424 n.1) (noting that the Nevada Supreme Court had previously reviewed the transcript of the Iowa plea colloquy and was satisfied that Hogan had knowingly waived his trial rights). In addition, the Nevada Supreme Court reiterated that "[w]e have previously determined, and it is now the law of the case, that Hogan's trial and appellate counsel were clearly effective and that the criteria for relief established by *Strickland v. Washington* . . . have not been satisfied." *Id.* at 716.

Hogan now argues that he received ineffective assistance of trial counsel regarding his Iowa conviction. He offers two reasons. First, Hogan argues that Nevada trial counsel were ineffective because they failed to file a timely collateral attack in Iowa challenging the validity of his prior Iowa guilty plea. Specifically, Hogan argues that the guilty plea violated Iowa law, and therefore his Nevada trial counsel failed to adequately investigate and timely challenge the Iowa conviction, and seek post-conviction relief in the Iowa courts. Second, aside from challenging the Iowa conviction itself, Hogan argues that Nevada trial counsel were ineffective because they failed to challenge the circumstances underlying his manslaughter conviction to show that the state had not proven that his Iowa conviction was, in fact, a crime of violence. In 1971, when he pled guilty, the Iowa criminal statutes did not distinguish between voluntary and involuntary manslaughter. *See State v. Shimon*, 182 N.W.2d 113, 114 (Iowa 1970). Hogan argues that, as a result, his conviction did not qualify for the crime-

of-violence aggravating circumstance under Nevada law. We will address each claim separately.

### a. Failure to collaterally attack Hogan's Iowa conviction in Iowa

The district court assumed that Hogan was prejudiced by his trial counsel's failings because there was a "reasonable probability" the Iowa conviction would have been vacated if Hogan had timely challenged it. The district court also recognized "a reasonable probability that the lone remaining aggravating circumstance . . . would not have been weighty enough, standing alone, for the jury to impose the death penalty." Ultimately, however, the district court denied the trial IAC claim, concluding that Hogan's trial counsel's performance was not deficient because "this court is unable to conclude that Hogan's counsel were obligated by prevailing norms at the time to . . . collaterally attack the Iowa conviction in the Iowa courts."

To demonstrate ineffective assistance of trial counsel, Hogan must demonstrate that Nevada counsel performed deficiently and that this deficiency prejudiced him. *Strickland*, 466 U.S. at 687. An attorney's "performance is deficient if, considering all the circumstances, it 'fell below an objective standard of reasonableness . . . under prevailing professional norms.'" *Jones v. Ryan*, 52 F.4th 1104, 1116 (9th Cir. 2022) (quoting *Strickland*, 466 U.S. at 688) (alteration in original). We begin with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. This objective approach requires us "to affirmatively entertain the range of possible 'reasons [Hogan's] counsel *may* have had for proceeding as [they] did.'" *Leavitt v. Arave*, 646 F.3d 605, 609 (9th Cir. 2011)

(emphasis in original) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011)).

To determine whether performance was constitutionally deficient, we look to "prevailing professional norms" at the time of trial. *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010). "That standard is necessarily a general one," but guidance manuals, restatements of professional standards, and ABA guidelines are useful to establish these norms, provided that they were in effect at the time of counsel's representation. *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009). We do not get to second-guess counsel based on guidelines that did not exist "when the representation took place." *Id.*; *see also id.* at 7–9 (disapproving reliance on ABA capital case guidelines published after the trial). Moreover, such norms are "'only guides' to what reasonableness means, not its definition," *id.* at 8 (quoting *Strickland*, 466 U.S. at 688); such guidelines are not "inexorable commands," *id.*

Hogan points to several publications, an affidavit, and two letters as evidence that his counsel was obligated to pursue collateral relief in Iowa courts for his 1971 conviction. Several of these sources did not exist at the time of Hogan's 1985 trial.[5] We decline to give them any weight in our analysis. *See id.* at 8 ("Judging counsel's conduct in

---

[5] For example, the California Public Defender Association Death Penalty Defense Manual is from 1986. The ABA Postconviction Death Penalty Project Manual is dated 1988. The National Legal Aid Defender Association Capital Standards were approved for adoption in 1987, and the NLADA manual was not published until 1988. *See* NLADA Standards for the Appointment and Performance of Counsel in Death Penalty Cases (1988), https://www.nlada.org/defender-standards/death-penalty. The NLADA manual itself states that "national standards on the assignment and performance of counsel in capital cases did not exist prior to these Standards." *Id.*

the 1980's on the basis of these 2003 Guidelines . . . was error."). Hogan has identified three sources that cover the correct time period: (1) a 1984 article in *The Champion*, a publication of the National Association of Criminal Defense Lawyers; (2) a Declaration of Martin Wiener, a Nevada criminal defense attorney; and (3) two letters from Paul Shinkle, the attorney who represented Hogan before the Iowa Supreme Court.

As relevant to Hogan's appeal, *The Champion* article states that multiple avenues exist to challenge evidence of a prior conviction. "[A] prior conviction may be subject to exclusion because defendant was not represented by counsel and did not waive that right, because the prior conviction was the product of an involuntary guilty plea, or because counsel in the previous case rendered ineffective assistance." Gail R. Weinheim & Michael G. Millman*, Legal Issues Unique to the Penalty Trial*, The Champion, Mar. 1984, at 33, 35 (citations and footnote omitted). It further comments that "[s]tate law may provide additional reasons for excluding this evidence," including challenging a prior conviction for lack of counsel, involuntary guilty plea, or ineffective assistance of counsel. *Id.* The article does not explain how counsel should raise or present such challenges.

The 2016 declaration from Martin Wiener describes what Wiener perceived to be the norms in 1985, based on his consultation with many of the sources described above. Wiener is a Nevada attorney, formerly with the Clark County Public Defender's Office and the Federal Public Defender's Office for the District of Nevada, who had served as counsel in capital cases during the period Hogan was tried. According to Wiener, "competent counsel [in 1985] would have done whatever they could to challenge the unconstitutional Iowa prior conviction." Specifically, he

wrote that "[t]he most efficient and apparent way of challenging the Iowa conviction would have been to have Mr. Hogan file a pro se petition in Iowa, in which he asked the state court there to vacate the unconstitutional conviction." Wiener also argued that Hogan's counsel should have requested a continuance earlier. Wiener emphasized that "[e]ffective practitioners would have known in 1985 to challenge a patently unconstitutional conviction *in the court of origin*." For the proposition that practitioners at the time challenged convictions "in the court of origin," Weiner relied on *Johnson v. Mississippi*, 486 U.S. 578 (1988), which was decided after Hogan's trial. He further opined that "it would have cost counsel nothing to assist Hogan in filing a pro se petition [in Iowa]," and the filing of such a petition would have provided additional grounds for seeking a continuance in Nevada. Wiener also relied on guidelines published after Hogan's trial.

Paul Shinkle was Hogan's appointed counsel for his postconviction relief petition in Iowa. In letters to Nevada counsel in 1989 and 1990, Shinkle stated that Iowa lawyers would have known that Hogan's 1971 plea was constitutionally defective and that any challenge to his 1971 conviction had to be brought before the 1987 deadline. Shinkle stated that he was "concerned" about the lack of contact between Nevada and Iowa counsel. He concluded that Hogan's Nevada counsel was "ineffective in failing to contact an Iowa attorney" regarding Hogan's guilty plea.

Although Hogan does not cite to them, we have previously consulted the ABA Standards for Criminal Justice to determine whether counsel performed deficiently. *See Heishman v. Ayers*, 621 F.3d 1030, 1037 (2010); *Summerlin,* 427 F.3d at 629–30 (collecting cases). The 1980 version of the ABA standards, effective at the time of

Hogan's trial, stated that counsel had a duty "to conduct a prompt investigation of the circumstances of the case" and "explore all avenues leading to facts relevant to the merits . . . and the penalty." ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980).

From our review of these materials in the record and the applicable guidelines, we cannot discern that Nevada trial counsel performed deficiently. Many of the sources Hogan relies on simply specify that counsel must make timely challenges without specifying what form those challenges to a prior conviction must take. Both *The Champion* article and the 1980 ABA Guidelines offer only the most general of admonitions; neither makes any mention of an obligation of counsel to undertake a collateral attack on a prior conviction in another jurisdiction. A general charge to "explore all avenues" cannot form the basis for evaluating counsel's performance. These catch-all, gold-standard descriptions with sweeping statements cannot show that counsel's specific choices were deficient.[6]

---

[6] In addition, we agree with the district court that reliance on *Johnson v. Mississippi* is misplaced. The Supreme Court in *Johnson* recited that "[a]fter his Mississippi conviction, . . . [Johnson's] attorneys successfully prosecuted a postconviction proceeding in New York in which they persuaded the Monroe County Court that petitioner had been unconstitutionally deprived of his right to appeal." 486 U.S. at 582. In a subsequent appeal, his conviction was reversed. The Supreme Court held that Mississippi could not rely on the vacated conviction as an aggravating circumstance in his death sentence. *Id.* at 586. The Court's decision does not disclose who represented Johnson or the circumstances under which the New York petition was filed. Johnson was well represented, but *Johnson* falls far short of establishing a normative standard for judging the effective assistance of counsel. *See Premo v. Moore*, 562 U.S. 115, 122 (2011) ("[T]he question is whether an

Nor do the Wiener and Shinkle declarations demonstrate that counsel was ineffective for failing to help Hogan collaterally challenge his conviction in Iowa. Wiener suggests, for example, that counsel could have satisfied minimum standards by helping Hogan file a pro se petition in Iowa, and Shinkle stated that an Iowa lawyer would have known that a challenge to the 1971 conviction had to be filed by 1987. But in fact, any challenge at the time of trial in 1985 to the 1971 conviction was unlikely to have succeeded in Iowa. At that point Hogan's Iowa conviction was fifteen years old; Hogan had failed to bring any challenge during that time. In July 1984, a three-year statute of limitations on postconviction challenges in Iowa became effective. *See* Iowa Code § 663A.3 (1985). Hogan's 1971 Iowa conviction fell far outside that three-year limitations period. Although in 1986 the Iowa Supreme Court established an equitable exception allowing "all potential postconviction applicants whose convictions became final prior to July 1, 1984" until June 1987 to file their applications for postconviction relief, *see Brewer v. Iowa Dist. Ct. for Pottawattamie Cnty.*, 395 N.W.2d 841, 844 (Iowa 1986), at the time of Hogan's trial in May 1985, a reasonable attorney would have thought the claim was time-barred. As the Iowa Supreme Court observed in its decision affirming dismissal of Hogan's 1989 post-Nevada-conviction petition:

> Simply put, it is an "obvious fact of life that most criminal convictions do in fact entail adverse collateral consequences." Hogan's inability to accurately predict future events, and adjust his behavior accordingly, is not the

---

attorney's representation amounted to incompetence . . . not whether it deviated from best practices or most common custom.").

> sort of factual circumstances reasonably
> triggering [an exception to the period for
> filing an application for relief].

*Hogan*, 454 N.W.2d at 361 (quoting *Sibron v. New York*, 392 U.S. 40, 55 (1968)).

We acknowledge that Hogan's trial counsel faced significant challenges. Hogan's trial counsel described in depositions that the Clark County Public Defender's Office was chronically underfunded, and the public defenders had no capital-specific training. Nevertheless, Hogan's counsel sought multiple avenues to obtain additional help. Although, "due to cost constraints," Hogan's trial counsel was "not permitted to send an investigator to Iowa," Hogan's counsel *did* make some contacts in Iowa and *did* challenge the validity of the Iowa conviction, albeit not in Iowa. Cooper filed file a fourth motion to continue the start of the trial so he could pursue his Iowa investigation, but the court granted only a two-day extension. Trial counsel tried to reach Hogan's attorney in Iowa, but he had either died, or his files were not retrievable. Trial counsel also contacted the Black Hawk County Public Defender's Office to obtain records and other assistance for Hogan. The Black Hawk County Public Defender's Office turned over Hogan's court files, including a transcript of Hogan's plea colloquy.

Using these materials, Hogan's counsel vigorously pursued a strategy of challenging the State's use of the Iowa conviction in his Nevada proceedings, filing a motion to strike the State's use of the Iowa conviction. Instead of using its resources to challenge his Iowa conviction in Iowa, counsel focused on persuading the Nevada court that Hogan's Iowa conviction was constitutionally infirm under Nevada law and could not be used. *See* NRS § 175.552.

Counsel pointed out that Hogan was initially charged with open murder in Iowa, a charge that did not differentiate between murder in the first or second degree. The charge was reduced to manslaughter, and Hogan accepted the State's offer to plead to the lesser charge. Counsel argued that "[t]he elements of the offense of manslaughter, in whatever form were never explained to Mr. Hogan," and, as a result, he had not pleaded guilty "voluntarily and understandingly." *See Scott*, 630 P.2d at 258 (quoting *Boykin*, 395 U.S. at 244).

Given these efforts, the relevant question is whether a competent lawyer in 1985 would have challenged the Iowa conviction despite the apparent time bar and even though the Nevada challenge had considerable merit. *Strickland* makes clear that counsel must make "reasonable decision[s]." 466 U.S. at 690–91. Those decisions must reflect the on-the-ground reality of litigation and not an idealized, unattainable model. *See Bobby*, 558 U.S. at 11. In sum, "[c]ounsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011).

Counsel's motion to strike the prior conviction fits easily within the *Harrington v. Richter* standard and within the broad guidelines discussed in *The Champion* article. That motion directly challenged Hogan's plea colloquy as involuntary under Nevada's own requirements. Nevada law prohibits the use of any "evidence which was secured in violation of the Constitution of the United States or the constitution of the State of Nevada." NRS § 175.552(3). And Hogan's counsel briefed the trial court on decisions of the Nevada Supreme Court in which it had reversed

convictions where the defendant had pleaded guilty without having been advised of the nature of the crime and the plea. *See*, *e.g.*, *DuBose v. State*, 682 P.2d 195 (Nev. 1984); *Ridings*, 669 P.2d at 719; *Standen*, 657 P.2d at 1160–62. Counsel further pointed out that the Nevada Supreme Court had excluded evidence of prior convictions where the pleas were involuntarily given. *See*, *e.g.*, *Scott*, 630 P.2d at 258.

Moreover, challenging the conviction in Nevada under Nevada law rather than in Iowa had advantages for Hogan. Hogan had pleaded to a reduced charge of manslaughter in Iowa. A successful challenge to that conviction might have exposed Hogan to a retrial and the possibility of a more severe sentence. The Wiener and Shinkle opinions as to what a competent lawyer would have done do not take account of that consideration or, for that matter, of the timeliness problem in Iowa at the time of trial, or the possible merit of the competing strategy of challenging the Iowa conviction in Nevada under Nevada law.

In sum, trial counsel's decision to focus on the Nevada challenge rather than a potential out-of-jurisdiction challenge in the court of origin was a reasonable strategic decision, particularly given the constraints of time and resources. *See Harrington*, 562 U.S. at 107; *Strickland*, 466 U.S. at 690–91. Because this decision reflects "the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, Hogan has not rebutted the presumption that trial counsel's performance was reasonable. We conclude that Hogan did not receive ineffective assistance of counsel because counsel did not challenge his prior conviction in Iowa.

b. Failure to collaterally attack Hogan's Iowa conviction as a crime of violence.

Hogan also cannot demonstrate IAC for counsel's failure to challenge the Iowa conviction as a crime of violence under NRS § 200.033(2).  At the time of Hogan's Iowa conviction, Iowa did not distinguish between voluntary and involuntary manslaughter.  Iowa Code § 690.10 (1971); *see State v. Shimon*, 182 N.W.2d 113, 114 (Iowa 1970).  Hogan maintains that because he pleaded guilty to "manslaughter," counsel should have argued that this conviction did not constitute a crime of violence under Nevada law.  Hogan also asserts that if counsel had challenged this aggravating circumstance, the trial court would not have allowed the State to present it to the jury.  In response, the State asserts that, regardless of whether trial counsel was competent in not making the crime of violence argument, Hogan cannot demonstrate prejudice.

Wiener's declaration proposes that competent counsel "would have researched Iowa's definition of manslaughter" to see whether it met the violent felony criteria for purposes of Nevada's aggravating circumstances.  Similarly, *The Champion* article mentions that state law may limit the use of prior convictions for violent offenses.  Weinheim & Millman, *Legal Issues*, *supra*, at 35 (citations and footnote omitted).  In such cases, "counsel should consider requesting that the prosecution demonstrate the existence of those elements outside the jury's presence."  *Id.*

Hogan cannot succeed on this IAC claim because he cannot demonstrate prejudice from counsel's failure to challenge the crime-of-violence aggravator.  To demonstrate prejudice, Hogan must show "a reasonable probability that, absent the errors, the sentencer—including an appellate

court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "A reasonable probability is one 'sufficient to undermine confidence in the outcome,' but is 'less than the preponderance more-likely-than-not standard.'" *Lambright v. Schriro*, 490 F.3d 1103, 1121 (9th Cir. 2007) (quoting *Summerlin*, 427 F.3d at 640, 643) (internal quotation marks and citation omitted). "However, [a] reasonable probability means a substantial, not just conceivable, likelihood of a different result." *Jones*, 52 F.4th at 1116 (quotations and citations omitted) (alteration in original).

We conclude that any such challenge from Hogan was destined to fail. At the time of Hogan's trial, Nevada courts considered any evidence in the record to determine whether a prior conviction constituted a crime of violence. *See Dennis v. State*, 116 Nev. 1075, 1082 (2000) (considering police reports, judgments of conviction, and testimony of victims); *Parker v. State*, 109 Nev. 383, 393 (1993) (considering judgment of conviction and testimony of victims and probation officer). *See also Redeker v. Eighth Judicial Dist. Court*, 127 P.3d 520, 525–26 (Nev. 2006).[7] There was ample evidence in the Iowa record demonstrating that the facts underlying Hogan's manslaughter conviction were violent. There were two autopsy reports, which reached slightly different conclusions, neither of them favorable to Hogan. The first autopsy report described

---

[7] In 2006, the Nevada Supreme Court addressed for the first time the scope of evidence that may properly be considered in the crime of violence inquiry, and limited the court's consideration to "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge." *Id.* at 525.

Kubicek's substantial injuries—she suffered a "[c]erebral edema," "[f]ocal cerebral contusions," and "multiple skull fractures," with "[s]kull fracture" being the probable cause of her death—without specifying whether the fracture resulted from Hogan slamming Kubicek's head into the car's frame or from her fall from the moving vehicle. The second autopsy report found that the skull fracture was likely caused by Hogan slamming her head against the frame of the car. Hogan himself had admitted before the Iowa court that he struck Kubicek's head against the car. Multiple witnesses saw Hogan hit Kubicek's head against the car and, later, drive without stopping after she fell from the moving vehicle. Others described Hogan's abuse of Kubicek before he struck her head on the car, including choking her while she screamed for help during their argument. In his Iowa plea, Hogan admitted through his counsel that he "struck [Kubicek's] head against the car, and on [counsel's] advice . . . entered a plea of guilty [to manslaughter]." *Hogan III*, 860 P.2d at 713–14 (quoting the colloquy at Hogan's plea hearing). Hogan's admission of these facts would have given the jury ample reason to find that Hogan's manslaughter conviction was for a crime of violence under Nevada law, regardless of whether Iowa's statute in the abstract fulfilled this requirement. Therefore, Hogan was not prejudiced by counsel's failure to challenge the crime-of-violence aggravator.

We conclude that Hogan did not receive ineffective assistance of trial counsel, and we affirm the district court's resolution of Claim 2(H).

B. *Certified Claim 2: Does* Martinez *Excuse Hogan's Procedurally Defaulted Trial IAC Claims (Claims 2(A)–(G) and (I)–(O))?*

We next address Hogan's several claims of trial-court IAC, which were procedurally defaulted in state court. We first explain the cause-and-prejudice inquiry under *Martinez*. We then apply those rules to Hogan's case, elaborating as to why Hogan may benefit from the *Martinez* exception. We conclude by providing additional guidance to the district court on remand.

1. Procedural default and the *Martinez* exception

Hogan has alleged several procedurally defaulted trial-court IAC claims (Claims 2(A)–(G), (I)–(O)). They are procedurally defaulted because he did not raise them in his first state post-conviction relief ("PCR") petition. Nor did he raise them in his second state PCR petition. When he raised the relevant claims in his third state PCR petition, the state courts rejected them on procedural grounds as both successive and untimely. In most instances, such procedural default would foreclose federal habeas relief; a state court's invocation of its own procedural rules bars federal relief so long as "(1) 'a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state procedural grounds.'" *Walker v. Martin*, 562 U.S. 307, 316 (2011) (alteration in original) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991)).

Federal habeas petitioners can overcome procedural default by demonstrating cause and prejudice. *See Smith v. Baldwin*, 510 F.3d 1127, 1146–47 (9th Cir. 2007) (en banc). Establishing cause requires a petitioner to show some

external impediment to compliance with state procedure. *See Coleman*, 501 U.S. at 753 (holding that a petitioner must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986))). For example, a petitioner may establish cause by showing that government officials withheld material information. *See id.* "Prejudice" requires the petitioner to show "not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Usually, attorney error cannot establish cause to overcome procedural default. This rule derives from first principles of agency law. "Attorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petition must 'bear the risk of attorney error.'" *Coleman*, 501 U.S. at 753 (citation omitted). Attorney error may, however, constitute cause if the attorney's failures constitute ineffective assistance of counsel under the Sixth Amendment. *See id.* at 753–54 ("Attorney error that constitutes ineffective assistance of counsel is cause, however."). As the Supreme Court explained in *Murray*, "if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State." 477 U.S. at 488. This determination turns not on "the gravity of the attorney's error" but on whether "it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor." *Coleman*, 501 U.S. at 754.

Because there is no constitutional right to counsel in state PCR proceedings, however, even egregious attorney error in seeking state postconviction relief usually cannot constitute cause. *See Davila v. Davis*, 582 U.S. 521, 524 (2017) ("Because a prisoner does not have a constitutional right to counsel in state postconviction proceedings, ineffective assistance in those proceedings does not qualify as cause to excuse a procedural default."). There can be no Sixth Amendment deprivation of the right to effective assistance of counsel in proceedings for which the constitution does not require counsel.

In *Martinez v. Ryan*, 566 U.S. 1 (2012), however, the Supreme Court carved out a limited exception to the rule that ineffective assistance of state PCR counsel cannot constitute cause. In Arizona, a person alleging ineffective assistance of trial counsel may not bring an IAC claim on direct review; instead, a defendant must bring a trial IAC claim for the first time in state PCR. *See id.* at 4. There are sound reasons for a state to adopt such a rule.[8] "Ineffective-assistance claims often depend on evidence outside the trial record," so "[d]irect appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim." *Id.* at 13. "[B]ut this decision is not without consequences for the State's ability to assert a procedural default in later proceedings." *Id.*

*Martinez* held that where state law requires trial IAC claims to be brought in state PCR in the first instance, "a procedural default will not bar a federal habeas court" from reviewing a trial IAC claim "if, in the initial-review collateral proceeding, . . . counsel in that proceeding was

---

[8] Nevada has done so. *See Rodney v. Filson*, 916 F.3d 1254, 1260 (9th Cir. 2019).

ineffective." *Id.* at 17; *see also Shinn v. Ramirez*, 596 U.S. 366, 371 (2022) ("[I]neffective assistance of postconviction counsel is 'cause' to forgive procedural default of an ineffective-assistance-of-trial-counsel claim, but only if the State required the prisoner to raise that claim for the first time during state postconviction proceedings."). This exception applies to "a single claim—ineffective assistance of trial counsel—in a single context—where the State effectively requires a defendant to bring that claim in state postconviction proceedings" in the first instance. *Davila*, 582 U.S. at 524–25. Put differently, when a state relegates trial-court IAC claims to state PCR proceedings, a claim of ineffective state PCR counsel is akin to a claim of ineffective direct-appeal counsel.

The *Martinez* exception is narrow. *See Shinn*, 596 U.S. at 387 ("*Martinez* was 'unusually explicit about the narrowness of [the] decision'" and "foreclosed any extension of its holding beyond the 'narrow exception' to procedural default at issue in that case." (citation omitted)). *Martinez*'s "chief concern" was "to ensure that meritorious claims of trial error receive review by at least one state or federal court." *Davila*, 582 U.S. at 532; *see id.* ("*Martinez* was concerned that a claim of trial error—specifically, ineffective assistance of trial counsel—might escape review in a State that required prisoners to bring the claim for the first time in state postconviction proceedings . . . ."). Beyond this narrow exception, "attorney error where there is no right to counsel," such as in other state PCR proceedings, "remains insufficient to show cause." *Shinn*, 596 U.S. at 380.

In sum, a petitioner must satisfy four requirements to benefit from the *Martinez* exception:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires [or effectively requires] that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (emphasis omitted) (second and third alterations in original) (quoting *Martinez*, 566 U.S. at 13–14, 15–18).

2. The *Martinez* exception applied to Hogan

The district court concluded that Hogan failed to establish "cause" under *Martinez* for two reasons. First, the district court observed that in *Martinez*, the procedural default was based on state rules "barring successive petitions," while Hogan's defaults "are based on the time limitation imposed by [Nevada law]." Second, the district court found that Hogan not only failed to raise the trial IAC claims in his first PCR petition but also in his second PCR petition, long after "the attorney who represented Hogan in his first state habeas action" had concluded his representation. Because Nevada's timeliness bar did not go into effect until January 1, 1993, *see Pellegrini v. State*, 34

P.3d 519, 525 (Nev. 2001), the district court reasoned that Hogan would not have been procedurally barred for timeliness reasons from raising his trial IAC claims in his second petition.  The district court thus decided that "there is an insufficient causal connection between the alleged ineffective assistance of Hogan's first post-conviction counsel and the procedural default at issue in this case," and that "[i]neffective assistance of counsel in Hogan's first state habeas action does not function as cause for the procedural default of claims raised in Hogan's third and fourth state habeas actions."  We disagree with the district court on both points.

First, we disagree that *Martinez* categorically does not apply when the procedural default is based on a state timeliness rule rather than a state prohibition on successive petitions.  *Martinez* articulated the standard for "cause" to excuse a procedural default; it did not limit the types of procedural default that initial-review IAC may excuse.  *See Martinez*, 566 U.S. at 18 ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, *a procedural default* will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." (emphasis added)).  Limiting the *Martinez* exception to cases in which the default was the result of a second-or-successive bar would vitiate *Martinez*'s purpose.  *Martinez*'s equitable rule helps "ensure that meritorious claims of trial error receive review by at least one state or federal court."  *Davila*, 582 U.S. at 532. Whether the result of a successive-petition bar or a timeliness rule, a procedurally defaulted trial-court IAC will otherwise "escape review in a State that require[s] prisoners

to bring their claim for the first time in state postconviction proceedings." *Id.* It is true that *Martinez* involved a successive-petition prohibition, but the consequence of the default there is no different from a case in which a lawyer who waits too long to raise the trial IAC claim: "no state court will ever review" the trial IAC claim. *Id.*

Nor do the cases limiting *Martinez* suggest that the type of procedural default matters. To the contrary, the limits on *Martinez* turn on the substance of the underlying claim for habeas relief, such as when the petitioner alleges ineffective assistance of appellate counsel. *See Davila*, 582 U.S. at 534 ("The Court in *Martinez* also was responding to an equitable consideration that is unique to claims of ineffective assistance of trial counsel and accordingly inapplicable to claims of ineffective assistance of appellate counsel."); *see id.* at 535 ("Extending Martinez to defaulted claims of ineffective assistance of appellate counsel would be especially troublesome because those claims could serve as the gateway to federal review of a host of trial errors, while Martinez covers only one trial error (ineffective assistance of trial counsel).").

Second, we disagree with the district court that Hogan's failure to raise the trial IAC claims in his second petition means that any ineffectiveness of his initial-review PCR counsel cannot constitute "cause" for the procedural default. As a threshold matter, the district court erred in reading *Martinez*'s "cause" requirement to mean proximate causation. "Cause" as it is used in *Martinez* refers not to tort causation, but to "good cause," as in, "[a] legally sufficient reason" for "why a request should be granted." Black's Law Dictionary (12th ed. 2024); *see Martinez*, 566 U.S. at 17 (describing a finding of "cause" as "allow[ing] a federal court to consider the merits of a claim that otherwise would

have been procedurally defaulted"). In determining whether a habeas petitioner has shown cause sufficient to overcome a procedural default, we have repeatedly held that "cause" refers to "a legitimate excuse for the default." *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984); *Guillory v. Allen*, 38 F.4th 849, 858 (9th Cir. 2022); *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1991). The district court erred in reading "cause" to demand a showing, akin to the proximate cause requirement applied in the realm of torts, of a causal connection between one default and the state court's refusal later to hear successive petitions.

To be sure, there must be *some* logical connection between the postconviction IAC and the procedural default to satisfy *Martinez*. To constitute "cause," the postconviction IAC must have "impeded or obstructed" Hogan from "complying with the State's established procedures." *Martinez*, 566 U.S. at 13 (2012); *see also Coleman v. Thompson*, 501 U.S. 722, 753 (1991) ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." (citation omitted)). But the requirement that postconviction counsel's IAC impeded or obstructed a petitioner's compliance with the state's procedural rules is not coextensive with the type of causation requirement urged by the dissent and the district court.

Here, the failure of Hogan's first PCR counsel to raise the relevant trial IAC claims impeded Hogan's efforts to comply with Nevada's procedural rule that all postconviction claims must be brought in the first PCR petition. *See* NRS § 34.810(2); *see also Hogan VI*, 2012 WL 204641, at *1. That failure also impeded Hogan's ability to

file a timely petition raising the trial IAC claims. Even if Hogan's second lawyer had raised the relevant trial IAC claims in his second PCR petition, his claims would still be procedurally defaulted under Nevada law. As we have pointed out, Nevada does ordinarily preclude the filing of second or successive petitions. So, had the trial IAC claims been raised in Hogan's second petition, they could have been timely but second or successive and therefore procedurally barred. This understanding of how Nevada law would have operated in this instance is confirmed by the fact that when the claims *were* raised in the third and fourth state petitions, they were precluded as *both* successive and time barred. And importantly, Nevada does not recognize the *Martinez* exception under state law, so Hogan's second PCR counsel could not have excused the procedural default by arguing that Hogan's first PCR counsel was ineffective.[9] *See Brown v. McDaniel*, 331 P.3d 867, 869 (Nev. 2014) ("We conclude that *Martinez* does not alter our prior decisions that a petitioner has no constitutional right to post-conviction counsel and that post-conviction counsel's performance does not constitute good cause to excuse . . . procedural bars . . . ."); *id.* at 872 ("[I]neffective assistance of post-conviction counsel does not establish cause for a habeas petitioner's procedural default . . . ."); *Hogan VI*, 2012 WL 204641, at *2 (holding that "an allegation of post-conviction counsel's ineffectiveness is not sufficient cause for filing another petition," so "Hogan [had] failed to demonstrate that

---

[9] Our ruling turns on the particulars of Nevada law. We do not reach the issue of whether the same result would follow if, for example, state law recognized the *Martinez* exception in state PCR proceedings.

counsel's ineffectiveness could excuse the untimely petition").[10]

Although in the end we disagree with the district court, we note that there are a number of procedural perplexities in this case that make the availability of the *Martinez* gateway difficult to ascertain. For one, traditionally, when a prisoner presents a mixed habeas petition containing both exhausted and unexhausted claims, the federal court will "stay and abey"—that is, it will stay and hold in abeyance federal habeas proceedings while the petitioner exhausts in state court the remaining claims presented in the petition. When the state court has disposed of the unexhausted claims, the federal court may then resume proceedings and consider the habeas petition in its entirety.

But the district court gave Hogan much more leeway than in the typical habeas case, permitting serial substantive amendments to Hogan's federal habeas petition over the course of more than two decades. In 1990, the district court stayed proceedings on Hogan's second amended federal petition to allow him to exhaust his claims in state court. Once the Nevada Supreme Court concluded its proceedings in 1996, in the ordinary course, the district court should have reopened the federal proceedings and ruled on Hogan's habeas petition. Instead, for reasons that are not apparent to us on this record, the district court permitted new habeas

---

[10] As this analysis shows, the dissent's focus on the second PCR petition as the relevant one for *Martinez* purposes, *see* Dissenting Op. at 92–93, 96–99, is incorrect. By not raising the trial IAC claims in the first PCR petition, Hogan's PCR counsel was precluded under Nevada law from raising them in any later petition, absent an applicable exception. *See* NRS § 34.810. It is that preclusion that is relevant for *Martinez* purposes, not whether the lawyer who filed the second PCR petition should have attempted to raise the procedurally defaulted trial IAC claims.

counsel to file *third* and *fourth* amended petitions to raise fourteen new trial IAC claims; his third amended petition was filed in 2001 and his fourth was filed in 2012—twenty-three years after he filed his first amended federal petition. Had the district court ruled promptly on Hogan's second amended federal petition and dismissed it, his third and fourth petitions would be subject to the federal requirements for filing a second or successive application and might well have been dismissed under pre-AEDPA rules as an abuse of the writ. *See McCleskey*, 499 U.S. at 479–89 (discussing the abuse-of-the-writ doctrine); 28 U.S.C. § 2244(b) (current rule); *see also Delo v. Stokes*, 495 U.S. 320, 321–22 (1990) (vacating a stay of execution "because respondent's fourth federal habeas petition clearly constitutes an abuse of the writ"). But Hogan's 2001 and 2012 filings were accepted by the district court not as *new* petitions, but *amended* petitions, and "an amended petition, filed after the initial one but before judgment, is not second or successive . . . . [but a] further iteration[] of the first habeas application." *Banister v. Davis*, 590 U.S. 504, 512 (2020) (citations and footnote omitted); *see Slack*, 529 U.S. at 486; *Woods v. Carey*, 525 F.3d 886, 888–89 (9th Cir. 2008).

Generally, a party may amend its pleading once as a matter of course. Fed. R. Civ. P. 15(a)(1). After that, it is "only with the opposing party's written consent or the court's leave," and such leave should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2); *see* 28 U.S.C. § 2242. Such amendments "relate[] back to the date of the original pleading." Fed. R. Civ. P. 15(c)(1). The record does not disclose whether the state granted written consent to Hogan to file his amended petitions or whether the district court granted leave. If it was the latter, we do not know what principles of equity or pre-AEDPA habeas

practice would have permitted the proceeding to be held open for new counsel to file amendments eleven and twenty-two years after Hogan filed his second amended petition. *See Rhines v. Weber*, 544 U.S. 269, 271 (2005) ("[S]tay and abeyance [of federal habeas petitions] should be available only in limited circumstances."); *Blake v. Baker*, 745 F.3d 977, 982 (9th Cir. 2014) (enumerating the required showing under *Rhines* as (1) "good cause" for failing to exhaust claims earlier; (2) "the unexhausted claims are potentially meritorious"; and (3) lack of "intentional[] dilatory litigation tactics" (quoting 544 U.S. at 278)). Nevertheless, if the state had grounds for protesting the third and fourth amended petitions, it has not raised such arguments to us, so any such arguments are forfeited for purposes of this appeal.[11] Under *Banister*, the amended petitions relate back to the original habeas petition, filed in 1989.

This unique procedural history assures us that our holding today will not expand *Martinez* beyond its carefully circumscribed limits.[12]

---

[11] We note that some of the practices we find puzzling in this case would likely not be permitted under AEDPA. AEDPA imposes a one-year limitation on filing federal habeas petitions. *See* 28 U.S.C. § 2244(d)(1). Any amendments filed after that time must relate to a "common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005); *see Walden v. Shinn*, 990 F.3d 1183, 1202–03 (9th Cir. 2021) (affirming denial of leave to amend a habeas petition to add IAC claims where the claims were untimely and turned on facts unique to each claim). This case was, of course, filed before AEDPA became effective.

[12] We are sympathetic to the dissent's concerns. But the dissent fails to mention *Banister* and how that case affects this case's unique procedural history. It is no surprise then that the dissent believes we are "extending *Martinez* to possibly allow federal courts to consider claims of trial

### 3. Guidance on remand

The State has agreed with Hogan that if *Martinez* is potentially available to him the district court is in the best position to evaluate his claims.  We have concluded that Hogan has demonstrated that *Martinez* relief may be available to him, and we agree with Hogan and the State that Claims 2(A)–(G) and (I)–(O) should be remanded to the district court for further proceedings consistent with this opinion.

We here set forth some guidance for the district court on remand.  *Martinez* has given us a particularly complex set of rules to apply, because it requires us to inquire into the ineffective assistance of *postconviction* counsel for failing to raise the ineffective assistance of *trial* counsel.  It is a double inquiry.  On remand, the district court must first decide whether Hogan's first PCR counsel was constitutionally ineffective for failing to raise the relevant trial-court IAC claims.  If it answers in the affirmative, it must then decide whether Hogan's trial counsel was unconstitutionally ineffective.  We have summarized *Martinez*'s holding as follows:

> Under *Martinez*, [the petitioner] must prove both "cause" and "prejudice."  To demonstrate "cause," [the petitioner] must show that "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v.*

---

counsel IAC that were not raised in either the first or second state PCR petition[.]"  Dissenting Op. at 98.  We are confident that our holding in this pre-AEDPA case does not expand *Martinez*.

> *Washington*." *Strickland* in turn requires a
> petitioner establish both (1) counsel's
> deficient performance and (2) prejudice. To
> demonstrate prejudice under *Strickland*, the
> petitioner "must show that there is a
> reasonable probability that, but for counsel's
> unprofessional errors, the result of the
> proceeding would have been different." . . .
> To establish "prejudice" under *Martinez*, the
> underlying trial counsel IAC claim must also
> be "a substantial one, which is to say . . . that
> the claim has some merit."

*Michaels v. Davis*, 51 F.4th 904, 930–31 (9th Cir. 2022) (per curiam) (citations omitted).

To find "cause," the district court must determine whether Hogan's first postconviction counsel, Maglaras, was ineffective for failing to raise the ineffective assistance of trial counsel. Judging the ineffective assistance of postconviction counsel is subject to *Strickland*'s two-part test: (1) deficient performance resulting in (2) prejudice. *See Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). If the district court determines that postconviction counsel was deficient, it then must assess *Strickland* prejudice. As a practical matter, there will be "considerable overlap" between the merits of the postconviction IAC claim and the merits of the trial IAC claim. *See Djerf v. Ryan*, 931 F.3d 870, 880 (9th Cir. 2019). As we noted in *Dickinson v. Shinn*:

> [T]he *Martinez* "cause" and "prejudice"
> analyses overlap with each other because the
> determination whether there is a "reasonable
> probability that the result of the post-

> conviction proceedings would have been different" had post-conviction counsel raised an issue is "necessarily connected to the strength of the argument that trial counsel's assistance was ineffective."

2 F.4th 851, 858 n.3 (9th Cir. 2021) (quoting *Clabourne*, 745 F.3d at 377); *see also Atwood v. Ryan*, 870 F.3d 1033, 1060 (9th. Cir. 2017) ("[A]ny deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised."). Therefore, to determine whether the *Martinez* gateway allows federal habeas review of a trial IAC claim, a federal court may have to make some inquiry into the merits of the defaulted trial IAC claim, as well as the performance of postconviction counsel.

The standards for judging the performance of postconviction counsel are not as well developed as the standards for assessing the performance of trial counsel. The ABA's *Death Penalty Guidelines* set forth very general standards for postconviction counsel without distinguishing between counsel's duties in the court of first review and an appellate court; they also do not distinguish between post-conviction-relief (PCR) or habeas counsel. *See* ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 10.15.1(A) (rev. ed., ABA 2018) (referring to "[c]ounsel representing a capital client at any point after conviction"). Those *Guidelines* state that "[p]ost-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality

capital defense representation." *Id.* 10.15.1(C); *see also id.* 10.15.1(E)(3) (postconviction counsel should "keep under continuing review the desirability of modifying prior counsel's theory of the case in light of subsequent developments"). The "arguably meritorious" standard means that the claim is "not frivolous," *Anders v. California*, 386 U.S. 738, 744 (1967), but it does not constitute the standard for judging what issues are deserving of appellate or postconviction review for purposes of determining the effective assistance of counsel. *Lee v. Thornell*, 104 F.4th 120 (9th Cir. 2024) ("A violation of the ABA Guidelines does not necessarily equate to a constitutional violation.").

This principle has particular relevance when the issue concerns the ineffective assistance of counsel, because the *Strickland* test begins with the "strong presumption that that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689 (quotation marks and citation omitted). "There are countless ways to provide effective assistance in any given case." *Id.* Accordingly, postconviction counsel must be afforded room to judge what errors of trial counsel—who must also be given the same "strong presumption" of professional judgment—will be most persuasive in postconviction review. This standard applies at two levels in the context of *Martinez*, because a *Martinez* claim requires a district court to determine that appellate or postconviction counsel was so deficient in his investigation of the grounds for postconviction review that he missed the deficient performance of trial counsel.

If the district court determines that Hogan's postconviction counsel performed deficiently under *Strickland*, the district court must still determine whether the deficient performance—the failure to raise the IAC of trial

counsel—was prejudicial to Hogan's petition for postconviction relief. That requires a determination that there is a "reasonable probability that the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377. If there is no ineffective assistance of postconviction counsel, then there is no "cause" under *Martinez*, and the analysis ends.

If the district court finds cause under *Martinez*, then the district court must consider whether there is "prejudice" under *Coleman*. That requires the district court to determine whether Hogan's underlying trial IAC claims are substantial. We have said that the showing required to establish a "substantial" trial IAC claim "is comparable to the standard for granting a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2); a petitioner 'need show only that jurists of reason could disagree with the district court's resolution of his constitutional claims.'" *Smith v. Baker*, 983 F.3d 383, 396 (9th Cir. 2020) (quoting *Runningeagle v. Ryan*, 825 F.3d 970, 983 n.14 (9th Cir. 2016) (internal quotation marks and citation omitted)); *see Michaels*, 51 F.4th at 930 ("[A] conclusion on the merits of an ineffective assistance of trial counsel claim under *Strickland* holds a petitioner to a higher burden than required in the *Martinez* procedural default context . . . .").

On remand, the district court should proceed in this manner to determine whether it is appropriate to reach the merits of the trial counsel IAC claims, Claims 2(A)-(G) and (I)-(O).

## IV. UNCERTIFIED ISSUES

Hogan also argues that we should expand the certificate of appealability to include five uncertified issues. Ninth Cir. R. 22-1(e). To expand the COA, Hogan must demonstrate a

"substantial showing of the denial of a constitutional right."
*Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999)
(quoting 28 U.S.C. § 2253(c)(2)).  In other words, he must
show that "the issues are debatable among jurists of reason;
that a court could resolve the issues [in a different manner];
or that the questions are adequate to deserve encouragement
to proceed further."  *Mendez v. Knowles*, 556 F.3d 757, 770–
71 (9th Cir. 2009) (alteration in original) (citation omitted).
For the reasons explained below, we will grant a COA with
respect to Uncertified Claim 1 (Claims 5(A) and (B)) but
deny a COA as to Uncertified Claim 2 (Claim 10),
Uncertified Claim 3 (Claims 11(C) and (D)), Uncertified
Claim 4 (Claim 25), and Uncertified Claim 5 (Claim 26).

A. *Uncertified Claim 1:  Did the District Court Err in
   Dismissing Hogan's Challenge to the Aggravating
   Circumstances (Claims 5(A) and (B)) as Procedurally
   Defaulted?*

At the penalty phase of Hogan's capital trial, the jury
found two aggravating circumstances:  (1) Hogan was
previously convicted of a felony involving the use or threat
of violence, NRS § 200.033(2); and (2) Hogan knowingly
created a great risk of death to more than one person, *id.*
§ 200.033(3).  In support of the first aggravator, the State
relied on Hogan's Iowa conviction for manslaughter.  In
support of the second aggravator, the State relied on Hogan's
attack on Brown after he had shot Hinkley.  Hogan
challenged both aggravators at trial; again on direct appeal,
*Hogan I*, 732 P.2d at 423–24; and in his second, third, and
fourth state postconviction petitions, *Hogan III*, 860 P.2d at
714–15; *Hogan V*, 178 P.3d 764 (Table); *Hogan VI*, 2012
WL 204641, at \*4–5.

In Claim 5 of Hogan's fourth amended habeas petition, which is the operative petition for our purposes, he divided his claim into three subclaims related to the aggravators.  In Claim 5(A), Hogan argued his death sentence must be set aside because his prior conviction was invalid.  In Claim 5(B), Hogan asserted that the aggravating circumstance alleging that he knowingly created a great risk of death to more than one person was unsupported by the evidence and was unconstitutionally vague.  In Claim 5(C), Hogan alleged that, in light of the two invalid aggravating circumstances, he is actually innocent of the death penalty.

The district court analyzed Claim 5 as "a single, unified claim that [Hogan] is actually innocent of the death penalty," and concluded the claim was procedurally defaulted because it was not raised until Hogan's third state postconviction petition.  On appeal, Hogan argues that these three subclaims are discrete, and that by construing the claim as one, the district court overlooked Hogan's procedural actual innocence claim that would help him overcome procedural default.[13]  To demonstrate that he is actually innocent of the death penalty, Hogan "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).

From reviewing the vast record before us, it is clear that Hogan has not consistently argued that these claims are distinct.  Although Hogan has not been consistent, we nevertheless conclude that Hogan plausibly alleged three

---

[13] Hogan does not appeal the dismissal of Claim 5(C) (substantive actual innocence).

discrete claims within Claim 5. [14]　　The arguments challenging each aggravator are legally and factually distinct.  In Claim 5(A), Hogan challenged the crime-of-violence aggravator, which refers to his Iowa conviction.  He argued that his Iowa conviction was invalid; that evidence of violence was not presented to the jury; and that the aggravating circumstance was unconstitutionally vague because Nevada law did not define "violent felony."  Hogan also argued that he received ineffective assistance because his trial counsel failed to investigate and challenge his Iowa conviction.  In Claim 5(B), Hogan challenged his great-risk-of-death aggravator, which turns on his attempt to murder Hinkley's teenage daughter and the most important witness to the murder, Shelley Brown.  Hogan argued that this aggravator did not factually apply to him, that it was unconstitutionally vague, and that it resulted in an unreliable sentence.  The Nevada Supreme Court treated each of these claims as distinct claims on direct review, and on his second, third, and fourth state postconviction petitions. *Hogan I*, 732 P.2d at 423–24 (addressing the crime-of-violence aggravator); *id.* at 424 (addressing the great-risk-of-death aggravator); *Hogan III*, 860 P.2d at 712–14 (addressing the crime-of-violence aggravator); *id.* at 714–15 (addressing the great-risk-of-death aggravator); *Hogan V*, 178 P.3d 764 (Table), at *3 (addressing the crime-of-violence aggravator); *id.* at *4 (addressing the great-risk-of-death aggravator);

---

[14] For example, in Hogan's opposition to Nevada's motion to dismiss, Hogan initially referred to Claim 5 as a single claim.  But later in the opposition, Hogan asserted that he "presented the entirety of Claim 5(A) on direct appeal" and that "Claim 5(B) was considered and rejected on the merits by the Nevada Supreme Court."  Hogan later asserted that Claim 5 represents three separate claims in his motion to alter or amend the judgment.

*Hogan VI*, 2012 WL204641, at \*5 (addressing the crime-of-violence aggravator); *id.* at \*4 (addressing the great-risk-of-death aggravator).  In the operative petition, Claim 5(C) was a single paragraph, stating that because the aggravating circumstances were invalid, Hogan was actually innocent of the death penalty and he had shown good cause and prejudice.  The Nevada Supreme Court rejected a similar argument on postconviction review.  *See Hogan III*, 860 P.2d at 715–16 (concluding that Hogan had not shown good cause and prejudice under NRS § 34.810(3)); *see also Hogan V*, 178 P.3d 764 (Table), at \*3.  Hogan asserted in his conclusion that imposing the death sentence based on these invalid aggravators would violate due process or the Eighth Amendment.

Reasonable jurists could disagree whether Claims 5(A) and (B) were procedurally defaulted because they were not raised as one claim until the third state postconviction petition.  We therefore grant Hogan's motion to expand the COA to include this issue.  We now turn to the district court's treatment of Claims 5(A) and (B).

1.  Did Hogan exhaust Claims 5(A) and (B)?

Federal habeas review requires that each claim be exhausted.  In other words, "[e]xhaustion requires that a petitioner fairly present his federal claims to the highest state court available."  *Walden*, 990 F.3d at 1196 (quoting *Davis v. Silva*, 511 F.3d 1005, 1008 (9th Cir. 2008)).

Hogan raised Claim 5(A) and Claim 5(B) in his direct appeal, and again in his state postconviction petitions.  The Nevada Supreme Court therefore had a full opportunity to resolve Hogan's claims.  *See*, *e.g.*, *Hogan I*, 732 P.2d at 423–24; *Hogan III*, 860 P.2d at 712–15.  It concluded that Claim 5(A) failed because "there was substantial evidence to

support the finding by the jury that the State had proved the existence of this aggravating circumstance beyond a reasonable doubt." *Hogan III*, 860 P.2d. at 714. It also rejected Claim 5(B):

> Under the "course of action" aspect of NRS [§] 200.033(3), the statute is satisfied if the perpetrator knowingly creates a great risk of death to more than one person by embarking upon a course of conduct that would normally be hazardous to the lives of more than one person. Obviously, one who intends to commit multiple murders within a closely related time and place engages in a course of conduct inherently hazardous to the life of more than one person. As we held in the opinion generated from Hogan's direct appeal, there was no error in finding that Hogan had engaged in criminal conduct falling within the purview of the aggravating circumstance defined by NRS [§] 200.033(3).

*Id.* at 715. In addition, the Nevada Supreme Court cited Supreme Court caselaw to resolve Hogan's claim that his guilty plea in Iowa was defective, both on direct appeal, *Hogan I*, 732 P.2d at 423–24 (citing *Henderson v. Morgan*, 426 U.S. 637, 647 (1976)), and in its consideration of his second petition for postconviction relief, *Hogan III*, 860 P.2d at 713 & n.1 (citing *Boykin v. Alabama*, 395 U.S. 238 (1969)). Because it upheld both aggravating circumstances, the Nevada Supreme Court also rejected Hogan's contention that "he is therefore actually 'innocent' of committing a capital crime." *Id.* at 712. Thus, the Nevada Supreme Court "actually considered and decided" Hogan's federal rights

regarding Claims 5(A) and 5(B), *Sandgathe v. Maass*, 314 F.3d 371, 377 (9th Cir. 2002) (quoting *Orr v. Orr*, 440 U.S. 268, 274–75 (1978)), and these claims were properly exhausted.

2. Does procedural default preclude federal review of Claims 5(A) and (B)?

Claims 5(A) and (B) were declared procedurally defaulted by the Nevada Supreme Court. The court dismissed Hogan's second postconviction petition as procedurally barred and an "abuse of the writ." *Hogan III*, 860 P.2d at 716. It also concluded that Hogan "failed to demonstrate a basis for habeas relief under the exceptional provisions of NRS [§] 34.810." *Id.* at 715. As part of the analysis for "exceptional provisions" under NRS § 34.810, the Nevada Supreme Court considered whether Hogan was "actually innocent" of the death penalty. *Id.* It concluded that "Hogan has simply failed to meet his burden of proving 'by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* at 716 (quoting *Sawyer*, 505 U.S. at 336).

The Nevada Supreme Court's declaration that Hogan's claims were procedurally defaulted does not necessarily preclude our review on the merits. Federal courts are prohibited from reviewing a claim subject to a state procedural default only if the state-court grounds are independent of federal law and adequate to support the judgment. *Robinson v. Ignacio*, 360 F.3d 1044, 1051 (9th Cir. 2004). "[W]e merely assume that there are no such grounds when it is not clear from the opinion itself that the state court relied upon an adequate and independent state

ground and when it fairly appears that the state court rested its decision primarily on federal law." *Michigan v. Long*, 463 U.S. 1032, 1042 (1983).

Hogan argues that he can overcome any procedural default of Claims 5(A) and (B) because the 1993 opinion was ambiguous in its reasoning regarding the dismissal of Hogan's petition and because the Nevada procedural rule was inadequate. [15] We need not decide whether the Nevada Supreme Court's decision was ambiguous, however, because we have previously held that, for the period in question here, the Nevada procedural rules were inadequate.

For a state-law procedural rule to be adequate, "[the] rule must be clear, consistently applied, and well-established at the time of petitioner's purported default." *Bargas v. Burns*, 179 F.3d 1207, 1211 (9th Cir. 1999) (quoting *Wells v. Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994)). In *Valerio v. Crawford*, we held, sitting en banc, that as of 1990 when Hogan filed his second state petition, "there was no clear, consistently applied, and well-established rule in capital cases that prevented the Nevada Supreme Court from addressing constitutional claims on the ground that those claims had not been presented in earlier proceedings." 306 F.3d 742, 778 (9th Cir. 2002) (en banc) (internal quotation marks omitted). We concluded that, at that time, the Nevada Supreme Court "exercised a general discretionary power to address" defaulted constitutional claims and so Nevada's successive-petition bar was "not adequate to bar federal review in capital cases." *Id.*; *see also Sechrest v. Ignacio*, 549 F.3d 789, 803 (9th Cir. 2008) ("NRS 34.810 is

---

[15] Although he challenged it below, Hogan does not challenge the independence of Nevada's procedural rules on appeal.

inadequate to bar federal habeas review of the claims deemed procedurally defaulted . . . .").

Here, Hogan's alleged procedural default of Claims 5(A) and (B) was recognized by the Nevada Supreme Court in 1993. *See Hogan III*, 860 P.2d at 712. Because we held in *Valerio* that Nevada's procedural rules were not consistently applied as of 1990 and so could not constitute an adequate state ground, we conclude that any procedural default by the time of *Hogan III* in 1993 does not bar our review on the merits.[16]

3.  Is Hogan entitled to relief?

We finally reach the merits of Hogan's challenge to the two aggravating circumstances.

a.  Conviction for a previous crime of violence

NRS § 200.033(2)(b) provides that any conviction of a "felony involving the use or threat of violence to the person of another" qualifies as an aggravating circumstance for first-degree murder. Hogan argues that this aggravator does not apply to him because the Iowa conviction was invalid.

---

[16] More recently, the Supreme Court has held that procedural rules that the state court may vary in its discretion can still be "firmly established" and "regularly followed." *See*, *e.g.*, *Johnson v. Lee*, 578 U.S. 605, 606–09 (2016) (per curiam) (holding that California's bar on claims raised for the first time on collateral review was adequate, despite the fact that state courts could exercise discretion to reach the merits despite the default); *Walker v. Martin*, 562 U.S. 307, 316–21 (2011) (holding that California's timeliness requirement qualified as an adequate state ground for the same reasons). We have not had cause to consider the adequacy of Nevada's successive petition bar in light of these holdings and do not do so now.

Hogan's direct challenge to the Iowa conviction is not cognizable.  The Supreme Court has held "that once a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid."  *Lackawanna Cnty. Dist. Att'y v. Coss*, 532 U.S. 394, 403 (2001); *see also West*, 652 F.3d at 1081 (applying *Lackawanna* to capital cases). Although *Lackawanna* recognized several exceptions to this rule—such as "where there was a failure to appoint counsel in violation of the Sixth Amendment"—none are applicable here.  532 U.S. at 404–06.  So we have no authority to reexamine the underlying Iowa conviction which provided the basis for the crime-of-violence aggravator.

> b.  Knowingly creating a great risk of death to more than one person

Hogan argues that he did not knowingly create a great risk of death to more than one person, and that this aggravator was unconstitutionally vague.  We reject both arguments.

NRS § 200.033(3) provides an aggravating circumstance to first-degree murder where "[t]he murder was committed by a person who knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person."  Hogan argues that the shootings of Hinkley and Brown were "discrete seriatim act[s], which endangered only one person at a time."  The Nevada Supreme Court addressed this issue on direct appeal:

> While there is a divergence of authority on this question, we believe that the statute includes a "course of action" consisting of two intentional shootings closely related in time and place, particularly where the second attack may have been motivated by a desire to escape detection in the original shooting. . . . Thus, there was no error.

*Hogan I*, 732 P.2d at 424 (citations omitted).

Hogan argues that the Nevada Supreme Court ignored *Jimenez v. State*, 775 P.2d 694 (Nev. 1989), in its consideration of his postconviction petition. We have no basis for reviewing the Nevada Supreme Court's determination of state law. *Peltier*, 15 F.3d at 862. The only basis for reviewing a state's construction of its own law is when the construction is "an obvious subterfuge to evade the consideration of a federal issue." *Id*. (citing *Mullaney*, 421 U.S. at 691); *see Creech v. Richardson*, 59 F.4th 372, 389–90 (9th Cir. 2023). There is no obvious subterfuge in the Nevada Supreme Court's treatment of *Jimenez*. *Jimenez* involved a stabbing, not a shooting, and a perpetrator who used two different weapons. 775 P.2d. at 697. The court found that the characteristics of the murder weapon counseled against the imposition of the great-risk aggravator:

> The first aggravating circumstance found by the jury was that the stabbing of these two victims with two different knives constituted the aggravated circumstance on the part of Jimenez of knowingly creating a great risk of death to more than one person by means of a

weapon, device or course of action which would normally be hazardous to the lives of more than one person.  This aggravating circumstance contemplates the use of a weapon or device that, by its nature or the circumstances of its use, "would normally be hazardous to the lives of more than one person."  NRS [§] 200.033(3).  Stabbing two persons with two different knives, even if Jimenez did both stabbings, does not make either knife a weapon or device that is normally dangerous to a multiplicity of persons.  Finally, even if, conceivably, a knife could be used under circumstances that would endanger the lives of more than one person in a single course of action, *such was not the case here*.  Jimenez, if acting alone, would have had to stab one victim and then turn his attention to stabbing another.  Under such a scenario, even a rock could have been used to kill both victims and thus improperly claimed to constitute a basis for an aggravating circumstance under NRS [§] 200.033(3).

*Id.* at 697–98 (emphasis omitted in part and added in part).

*Jimenez* distinguished two other Nevada Supreme Court cases with facts much closer to Hogan's.  In *Moran v. State*, 734 P.2d 712 (Nev. 1987), the Nevada Supreme Court concluded that firing a gun at the victim with another person nearby satisfied the requirements of NRS § 200.033(3).  *Id.* at 715; *see Jimenez*, 775 P.2d at 697.  And in *Nevius v. State*, 699 P.2d 1053 (Nev. 1985), the Nevada Supreme Court

upheld the great-risk aggravator for a defendant who attempted to shoot the victim while the victim's wife was in the same room. *Id.* at 243; *see Jimenez*, 775 P.3d at 698. The Nevada Supreme Court discussed *Moran* in its decision on Hogan's postconviction petition and concluded that "*Moran* alone would validate the finding of the NRS [§] 200.033(3) aggravator in the instant case where Hogan knew, as he fired his gun at his murder victim, that the victim's teenage daughter was in close proximity to the crime scene." *Hogan III*, 860 P.2d at 714. We can discern no evidence that the Nevada Supreme Court's analysis sought to avoid federal review.

We also reject Hogan's challenge to this aggravating circumstance as unconstitutionally vague. When a statute is challenged as vague without implicating the First Amendment, "we do not consider whether the statute is unconstitutional on its face." *United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001). Rather, "our concern is whether the [statute] is impermissibly vague in the circumstances of this case." *Id.* (alteration in original) (emphasis omitted) (quoting *United States v. Ocegueda*, 564 F.2d 1363, 1365 (9th Cir. 1977)).

Nothing in NRS § 200.033(3) as applied to Hogan is vague. The statute clearly covers a person who shoots and kills one person while others are present, and then attempts to silence a potential witness using the same weapon in the same manner. Such actions "would normally be hazardous to the lives of more than one person," *Hogan III*, 860 P.2d at 715, and fall squarely within the statutory definition. Thus, Hogan was properly on notice that this statutory aggravating circumstance could apply to him. We agree with the Nevada Supreme Court that Hogan's vagueness challenge "is meritless." *Hogan I*, 732 P.2d at 424 n.3.

B. *Uncertified Claim 2: Did the District Court Err in Dismissing Hogan's Sixth Amendment Right to Confrontation Claim (Claim 10)?*

Hogan asks us to issue a COA on his claim that the trial court's admission of several out-of-court statements violated his Sixth Amendment right to confront his accusers. We will address each challenged statement in turn.

At the time of Hogan's trial, the standard for Confrontation Clause questions was *Ohio v. Roberts*, 448 U.S. 56 (1980), which was later abrogated by *Crawford v. Washington*, 541 U.S. 36, 68 (2004). *Crawford* held that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* However, *Crawford* was not made retroactive on collateral review. *Whorton v. Bockting*, 549 U.S. 406, 417 (2007) ("Because Crawford announced a 'new rule' and because it is clear and undisputed that the rule is procedural and not substantive, that rule cannot be applied in this collateral attack on respondent's conviction unless it is a 'watershed rul[e] of criminal procedure' . . . ." (internal citations omitted)). We therefore apply *Roberts* as the standard here.

*Roberts* held that out-of-court statements are admissible if (1) the declarant is unavailable and (2) the statements bear adequate indicia of reliability. The Court explained:

> [T]he Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the

> declarant whose statement it wishes to use against the defendant.
>
> The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule."

*Roberts*, 448 U.S. at 65 (citations omitted) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107 (1934)).

Hogan argues that hearsay statements admitted from Hinkley failed to meet this standard because they are not excited utterances. Additionally, he argues that the statements admitted from Dr. Green are inadmissible because the government failed to show that Dr. Green was unavailable.

Hogan did not present the Confrontation Clause arguments as to Hinkley to the Nevada Supreme Court (although he did argue that the statements were inadmissible hearsay), so those claims are unexhausted. *See Rose v. Lundy*, 455 U.S. 509, 515–16 (1982). Nevertheless, we address Hogan's claim on the merits, because it fails all the same. *Cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Hogan did present the Confrontation Clause argument as to Dr. Green's

prior testimony, so we review under the pre-AEDPA de novo standard.

### 1.  Hinkley's statement to her daughter, Shelley Brown

First, Hogan challenges Hinkley's statement to her daughter the night of the murder.  Brown testified that Hinkley woke her up around 3:00 a.m. on November 19, 1984, and stated that "[Hogan] just threatened to kill me." Prior to Brown's statement, the court noted that hearsay objections made to the anticipated statements in earlier motions were overruled.  Hogan's counsel again objected when Brown was asked to describe a phone call Hinkley made.  The prosecutor withdrew the question, and the court never ruled on that objection.

On direct appeal, the Supreme Court ruled that this statement was admissible under NRS § 51.095, Nevada's "excited utterance" exception to the hearsay rule.  *Hogan I*, 732 P.2d at 423.  The district court, applying AEDPA, found Nevada's determination objectively reasonable and denied Hogan's claim on that basis.  Upon reconsideration, the Court applied pre-AEDPA standards, but found that a less deferential review of the state court's decision did not change its conclusion.

The Nevada Supreme Court found that this statement occurred "just after" Hogan threatened Hinkley.  *Hogan I*, 732 P.2d at 423.  We owe significant deference to the state court's factfinding.  *See Summerlin*, 427 F.3d at 629.  This statement bears sufficient indicia of reliability because the excited utterance exception is "a firmly rooted hearsay exception."  *Roberts*, 448 U.S. at 66; *see also* Fed. R. Evid. 803(2); *White v. Illinois*, 502 U.S. 346, 355 (1992) (spontaneous declarations are firmly rooted hearsay exceptions "that provide substantial guarantees of their

trustworthiness.").  We conclude that Hogan has not made a substantial showing of the denial of his Confrontation Clause rights.  28 U.S.C. § 2253(c)(2); *see Slack*, 529 U.S. at 484.

2.  Hinkley's statement to Elaine Lundmark

Second, Hogan challenges Hinkley's statement to Hinkley's friend and neighbor, Elaine Lundmark. Lundmark testified that Hinkley said "that Michael [Hogan] had pulled a gun out, and that she had woken [her daughter] up from sleep and brought her to [Lundmark's] house for safety" and also "that he had pulled a gun on her and said that he was going to kill her."  Hogan's counsel objected on the grounds of "hearsay and confrontation."[17]  The State proffered the statements as excited utterances, and the court overruled the objection.

As with Brown's statement, the Nevada Supreme Court ruled that this statement was admissible under Nevada's "excited utterance" exception to the hearsay rule.  *See* NRS § 51.095; *Hogan I*, 732 P.2d at 423.  And the district court found no error.

Hogan now argues that the delay between the threat and Hinkley's statement to Lundmark undermines the argument that Hinkley's statement was an excited utterance. According to the record, Hinkley had an hour to reflect or discuss the threat before she spoke to Lundmark, and she made the statement approximately an hour after Hinkley told Shelley of Hogan's threat.  Lundmark said at the time

---

[17] The quoted language is from Lundmark's testimony before the jury on May 14, 1985.  The cited objection was apparently made outside the presence of the jury on May 13, during Lundmark's testimony at an evidentiary hearing conducted on a motion to suppress a seized gun.

Hinkley made this statement, Hinkley and Shelley were "very upset, crying, [and] shaking."

Traditionally, a spontaneous statement is reliable because it is given "without the opportunity to reflect on the consequences of one's exclamation." *Winzer v. Hall*, 494 F.3d 1192, 1198 (9th Cir. 2007) (quoting *White*, 502 U.S. at 356). Because the one-hour pause gave Hinkley the chance to talk to Brown and an "opportunity to reflect," *White*, 502 U.S. at 356, we are willing to assume that this statement is not an excited utterance. But our assumption does not change anything because any error from this statement's admission was harmless. Hogan cannot show that he was prejudiced by Hinkley's statement to Lundmark because there was substantial evidence in the record of premeditation and deliberation. Two additional witnesses, Schneider and Green, testified that they heard Hogan threaten to kill Hinkley during the California trip. Both witnesses testified that they heard similar threats from Hogan more than once. Brown testified that the night of the murder, Hogan threatened to break down her door if Brown did not open it. Later that night, Brown heard Hinkley tell Hogan that he would have to move out of the house. Within a few minutes, Brown heard a gunshot and Hinkley yelled at Brown to run. Then Hogan shot Brown several times, with the same gun he used to kill Hinkley. The uncontested evidence clearly shows that Hogan premeditated the attack on Hinkley and Brown. Because any hearsay testimony is cumulative to threats reported by other witnesses, any error from its admission was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

### 3. Dr. Giles Sheldon Green's preliminary hearing testimony

Third, Hogan argues that Dr. Green's preliminary hearing testimony regarding Hinkley's autopsy should not have been admitted at trial. Hogan also argues that Nevada failed to prove that Dr. Green was unavailable or that his prior testimony was reliable.

Dr. Green was the medical examiner who performed Hinkley's autopsy. Dr. Green was unavailable to testify at trial due to emergency quadruple bypass heart surgery. At trial, over Hogan's counsel's objection, the court allowed Dr. Green's preliminary hearing testimony to be read into the record. The district court found that, because Hogan's counsel cross-examined Dr. Green at the preliminary hearing, Dr. Green's prior testimony bore sufficient "indicia of reliability" to be properly admitted under *Ohio v. Roberts*, 448 U.S. 56, 73 (1980). Moreover, the district court found that the Confrontation Clause did not require the trial court to postpone the trial to ensure the availability of Dr. Green. Lastly, the court noted that, even assuming there was a Confrontation Clause violation, any error was harmless given the overwhelming evidence of Hogan's guilt.

We find no Confrontation Clause error here. Dr. Green was clearly unavailable. Under *Barber v. Page*, the prosecution can demonstrate that a witness is unavailable if it made a good-faith effort to obtain his presence at trial. 390 U.S. 719, 724–25 (1968). Here, all parties conceded that Dr. Green could not testify at trial because he had undergone emergency quadruple bypass heart surgery. The prosecutor's office "maintained continuous weekly contact" with the medical examiner's office and confirmed that the earliest Dr. Green could be available to testify was late July

1985.  These efforts to secure Dr. Green's live testimony and to establish his unavailability were reasonable.  *See Roberts*, 448 U.S. at 74.  The prosecution therefore made a "good-faith effort" to reach Dr. Green and met its burden to establish that Dr. Green was unavailable.  *Barber*, 390 U.S. at 724–25.

Dr. Green's statements also have sufficient indicia of reliability.  Under *Dres v. Campoy*, 784 F.2d 996, 1001 (9th Cir. 1986), prior testimony is reliable if the defendant had the opportunity to cross-examine the witness at a prior hearing.  *See also Mancusi v. Stubbs*, 408 U.S. 204, 216 (1972).  Here, Hogan not only had the opportunity to cross-examine him at the preliminary hearing—Hogan *did* in fact cross-examine him.  Indeed, Hogan's counsel asked Dr. Green specific questions regarding potential causes for Hinkley's bruises at the preliminary hearing.  Thus, Dr. Green's testimony was not admitted in error.

We deny Hogan's request to expand the COA to include these claims because he has failed make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c).

C. *Uncertified Claim 3:  Did the District Court Err in Dismissing Hogan's Instructional Error Claims (Claims 11(C) and (D))?*

Hogan's third uncertified claim relates to jury instructional errors at the penalty phase of trial.  Hogan claims that the two jury instructions—one given and one omitted—rendered his sentencing proceeding constitutionally deficient.  succeed in challenging these jury instructions, Hogan must show that the "error 'had substantial and injurious effect or influence in determining

the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

1. Anti-sympathy instruction

Before jury deliberation at the sentencing proceeding, the trial court instructed the jury as follows:

> A verdict may never be influenced by sympathy, prejudice or public opinion. Your decision should be the product of sincere judgment and sound discretion in accordance with these rules of law.

Hogan's counsel objected and proposed an alternative instruction that enumerated twelve mitigating circumstances that the jury could consider. Hogan argues the anti-sympathy instruction precluded the jury from considering mitigating circumstances, such as mental disorders and family relationships that might naturally stir sympathetic feelings from the jury.

In addition to the anti-sympathy instruction, the jury also heard the following instruction on mitigating circumstances:

> Murder of the First Degree may be mitigated by any of the following circumstances, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime:
>
> > (1) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(2) Any other mitigating circumstance.

Hogan argues that this mitigating circumstance instruction was vague and contradictory to the anti-sympathy instruction, which left the jurors confused about the role of mitigating circumstances.

Hogan raised this same claim on direct appeal, and the Nevada Supreme Court rejected the claim. *Hogan I*, 732 P.2d at 424–25. Below, the district court initially applied AEDPA and held it must defer to the state court's determination, given there is no clearly established federal law holding an anti-sympathy instruction violates a defendant's constitutional rights. On reconsideration, the district court applied pre-AEDPA standards but still found no convincing legal authority for granting habeas relief based on the anti-sympathy instruction.

We cannot discern how the anti-sympathy instruction, or the anti-sympathy instruction in combination with the mitigating circumstances instruction, could have had an "injurious effect" on the verdict. The trial court's instruction to disregard sympathy also could have prevented the jury from considering sympathy for the victim or the victim's family. *See id.* at 425 ("[S]uch an instruction is not without benefit to a defendant since it precludes a jury from selecting a penalty provoked by sympathy for victims or their survivors."). In this way, excluding sympathy from the jury's consideration may have benefitted Hogan. Further, the Supreme Court has concluded that an anti-sympathy instruction does not violate the Eighth and Fourteenth Amendment principle prohibiting the State from barring relevant mitigating evidence during the penalty phase. *See Saffle v. Parks*, 494 U.S. 484, 489–91 (1990). And the Court has rejected the argument that an anti-sympathy instruction

may cause a rational juror to disregard mitigating evidence. *California v. Brown*, 479 U.S. 538, 542–43 (1987), *holding modified by Boyde v. California*, 494 U.S. 370 (1990). We find no error in the district court's analysis regarding the anti-sympathy instruction.

2. Deterrence instruction

During the jury instruction conference, Hogan's counsel proposed the following instruction:

> You are instructed there exists no reputable scientific evidence that capital punishment acts as a general deterrent to crime. You must decide what is a just punishment for Michael Hogan without regard as to how his punishment might affect the crime rate or the number of homicides committed by others, for to consider this would amount to improper speculation.

The trial court declined to provide this instruction to the jury. Hogan appealed this denial, and the Nevada Supreme Court affirmed the trial court's decision because the deterrence instruction "was not warranted under any authority." *Hogan I*, 732 P.2d at 424. The district court held that the state court's decision was not contrary to clearly established federal law and found the claim "without merit." Upon reconsideration, the district court applied pre-AEDPA standards, but its conclusion remained unchanged.

An omission of the defense's preferred instruction is "less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). The proposed deterrence instruction did not state an element of

Hogan's crime, and Hogan's sole legal authority for the proposition is Justice Breyer's concurring opinion in *Ring v. Arizona* stating that "[s]tudies of deterrence are, at most, inconclusive." 536 U.S. 584, 615 (2002) (Breyer, J., concurring). An instruction speculating about the effects of the death penalty on others was not required to ensure that Hogan received a fair trial.

We decline to expand the COA on this issue.

D. *Uncertified Claim 4: Did the District Court Err in Dismissing Hogan's Lethal Injection Claim (Claim 25)?*

Finally, we review uncertified Claim 25 of Hogan's fourth amended federal petition, in which he alleges that Nevada's lethal injection procedures violate the Eighth Amendment. Hogan argues that Nevada's use of midazolam and cisatracurium will cause him to suffer a "tortur[ous] and "lingering death." *See Baze v. Rees*, 553 U.S. 35, 49 (2008) (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)). The Nevada Supreme Court dismissed this claim as untimely and successive. *Hogan VI*, 2012 WL 204641, at \*2. The district court ruled the claim was procedurally barred because Hogan failed to present the claim in state court until his fourth state PCR petition.

Hogan argues that because challenges to the lethal injection protocol are not cognizable in Nevada state habeas actions, *McConnell v. State*, 212 P.3d 307, 309–11 (Nev. 2009) (en banc) (per curiam), the procedural default doctrine should not apply, and he asks for a remand back to district court for an evidentiary hearing regarding the lethal injection protocol.

When method-of-execution claims become ripe is an open question in our circuit. *See Beardslee v. Woodford*, 395

F.3d 1064, 1069 n.6 (9th Cir. 2005) (per curiam) ("To date, we have not resolved the question of when challenges to execution methods are ripe."). We have previously held that such claims become ripe "when the method [of execution] is chosen," *Pizzuto v. Tewalt*, 997 F.3d 893, 897, 899, 902 n.9 (9th Cir. 2021), but we have also said that a method of execution challenge is not ripe when the state has no protocol that can be implemented at the time of the challenge, *Floyd v. Filson*, 949 F.3d 1128, 1152 (9th Cir. 2020). We have not yet addressed how alternate methods of execution may affect ripeness.

In this case, the protocol Hogan disputes was replaced in 2021 by a new cocktail of lethal drugs. *Compare Nev. Dep't of Corr. v. Eighth Jud. Dist. Court*, Nos. 74679, 74722, 2018 WL 2272873, at *2 (Nev. May 10, 2018) (NDOC 2018 protocol specifying the use of diazepam, fentanyl, and cisatracurium), *with* "Acquisition and Preparation of Drugs for Lethal Injection," *Nevada Department of Corrections*, Execution Manual, EM-103 (specifying the use of (1) fentanyl or alfenanil, (2) ketamine, (3) potassium chloride or potassium acetate, and the option to add (4) cisatracurium). Under the new protocol, "Nevada presently has no execution protocol that it *could* apply." *Floyd*, 949 F.3d at 1152 (emphasis added). Nevada has no usable ketamine, and drug manufacturers have blocked Nevada from purchasing additional midazolam. *See id.* (citation omitted). Moreover, Nevada has not issued an execution warrant, so it is premature for us to speculate on any future developments. Thus, we find that Hogan's drug-specific lethal-injection challenge is not yet ripe, and this claim is not justiciable.

We therefore decline to expand the COA to address Hogan's method-of-execution claims.

E. *Uncertified Claim 5: Did the District Court Err in Dismissing Hogan's Cumulative Errors Claim (Claim 26)?*

Hogan has requested that we expand the COA to consider cumulative error. For the reasons stated above, there are no potential errors that could accumulate. Therefore, we deny the request to expand the COA on this issue.

## V. CONCLUSION

For the foregoing reasons, we reverse the district court's decision as to Claims 2(A)–(G) and (I)–(O) and remand for further proceedings consistent with this opinion. We grant the motion to expand the Certificate of Appealability as to Claims 5(A) and (B), but affirm the district court's judgment on the merits. We affirm on all other claims.

**AFFIRMED** in part and **REVERSED** and **REMANDED** in part.

APPENDIX A

Timeline

Jan. 1971:     Hogan pleads guilty to manslaughter in Iowa.

May 1985:      Hogan's convicted of the murder of Heidi Hinkley in Nevada.

Oct. 1987:     U.S. Supreme Court denies certiorari review of Hogan's conviction and sentence after direct review in the Nevada Supreme Court. *Hogan I*, 732 P.2d 422 (1987), *cert. denied*, 484 U.S. 872 (1987).

Nov. 1987:     Hogan files pro se his first state habeas petition ("state PCR") in Nevada.

Dec. 1988:     Nevada Supreme Court dismisses Hogan's appeal of the district court's denial of his first state PCR. *Hogan II*, 809 P.2d 607 (Table), No. 18994 (Nev. Dec. 21, 1988) (order dismissing appeal); Excerpts of Record 133–34.

Jan. 1989:     Hogan files a pro se habeas petition in the U.S. District Court in Nevada.

Apr. 1989:     Now represented by Quintana, Hogan files a first amended federal habeas petition.

Mar. 1990:     Hogan, still represented by Quintana, files his second amended federal habeas petition.

Sept. 1990:    U.S. District Court of Nevada stays federal proceedings to allow Hogan to exhaust new claims in state court.

Nov. 1990:     Hogan files his second state PCR petition in Nevada.

Sept. 1993:     Nevada Supreme Court denies Hogan's appeal of the district court's dismissal of his second state PCR as successive. The Nevada Supreme Court denies rehearing, and the U.S. Supreme Court denies certiorari. *Hogan III*, 860 P.2d 710, 715–16, *on motion for rehearing*, *Hogan IV*, 916 P.2d 805 (1996), *cert denied*, 519 U.S. 944 (1996).

Aug. 1997:      U.S. District Court for Nevada reopens federal habeas proceedings.

Mar. 2001:      Hogan, now represented by Cartledge and Cornell, files a third amended federal habeas petition in U.S. District Court of Nevada.

Dec. 2003:      U.S. District Court of Nevada stays federal proceedings so Hogan can exhaust new claims in state court.

Feb. 2004:      Hogan files his third state PCR petition in Nevada.

Nov. 2006:      Nevada Supreme Court denies Hogan's appeal of the lower court's denial of his third state PCR petition as successive and untimely. *Hogan V*, 178 P.3d 764 (Table), No. 46293 (Nov. 15, 2006) (order of affirmance); Excerpts of Record 96–102.

Feb. 2008:      Federal Public Defender's office is appointed to represent Hogan.

Aug. 2004:      U.S. District Court for Nevada grants stay for Hogan to present unexhausted claims in state court.

Sept. 2008:     Hogan files his fourth state habeas petition in

Nevada

Jan. 2012: The Nevada Supreme Court denies Hogan's appeal of the lower court's denial of his fourth state habeas petition as successive and untimely. *Hogan VI*, No. 54011, 2012 WL 204641 (Nev. Jan. 20, 2012)

Oct. 2012: Hogan files a fourth amended federal habeas petition.

Mar. 2014: Government files a motion to dismiss. Court dismisses all claims as procedurally defaulted except Claims 2(H), 10, 11(C) and (D), and 26.

Sept. 2015: District Court granted motion for an evidentiary hearing re: 2(H).

Mar. 2018: District Court denies all remaining claims without holding the evidentiary hearing.

## APPENDIX B

| Claim, as numerated on Hogan's operative, fourth amended federal petition | First Presented to the Nevada State Court |
|---|---|
| **Claim 1(A):** Use of "Premeditation" instruction | 3rd state petition |
| **Claim 1(B):** Use of "Implied Malice" instruction | 3rd state petition |
| **Claim 1(C):** Use of "Malice Aforethought" instruction | 3rd state petition |
| **Claim 2(A):** Ineffective assistance of trial counsel for failing to investigate and present mitigating evidence during the penalty proceedings | 3rd state petition |
| **Claim 2(B):** Ineffective assistance of trial counsel for failing to obtain adequate expert assistance during guilt and penalty proceedings | 3rd state petition |
| **Claim 2(C):** Ineffective assistance of trial counsel for failing to adequately question witnesses during the penalty proceedings | 3rd state petition |

| | |
|---|---|
| **Claim 2(D):** Ineffective assistance of trial counsel for presenting a deficient closing argument during the penalty phase | 3rd state petition |
| **Claim 2(E):** Ineffective assistance of trial counsel for failing to conduct an adequate guilt phase investigation | 3rd state petition |
| **Claim 2(F):** Ineffective assistance of trial counsel for presenting known harmful expert testimony during the guilt phase | 3rd state petition |
| **Claim 2(G):** Ineffective assistance of trial counsel for failing to develop a social history and provide that information to guilt phase experts | 3rd state petition |
| **Claim 2(H):** Ineffective assistance of trial counsel for inadequately investigating the Iowa conviction to challenge aggravating factor | 1st state petition |
| **Claim 2(I):** Constructive denial of trial counsel when court denied counsel's request for continuance | 3rd state petition |

| | |
|---|---|
| **Claim 2(J):** Constructive denial of trial counsel because of trial counsel's headaches, conflict of evidence, and investigator's cocaine addiction | 3rd state petition |
| **Claim 2(K):** Constructive denial of trial counsel because of the lack of resources and training at the Clark County Public Defender. | 3rd state petition |
| **Claim 2(L):** Ineffective assistance of trial counsel for reemphasizing prejudicial evidence during cross examination of a witness | 4th state petition |
| **Claim 2(M):** Ineffective assistance of trial counsel for failing to request a mistrial or removal of a tainted alternate juror | 4th state petition |
| **Claim 2(N):** Ineffective assistance of trial counsel for failing to object to jury instructions described in Claim 1 and Claim 11 | 3rd state petition |
| **Claim 2(O):** Ineffective assistance of trial counsel for failing to advance mental state defense and request voluntary manslaughter instruction | 3rd state petition |

| | |
|---|---|
| **Claim 3:** Deprivation of constitutionally adequate expert assistance | 3rd state petition |
| **Claim 4:** Actual innocence of first-degree and attempted murder because of Hogan's mental state | 3rd state petition |
| **Claim 5(A):** Prior Violent Felony Agg. Cir. | Direct Appeal |
| **Claim 5(B):** Great Risk of Death Agg. Cir. | Direct Appeal |
| **Claim 5(C):** actual innocence because of above aggravating circumstances | 3rd state petition |
| **Claim 6:** Lack of special verdict form on mitigating circumstances | 4th state petition |
| **Claim 7(A):** Constitutionally inadequate voir dire because the jury was not "life-qualified" | Direct Appeal |
| **Claim 7(B):** Inclusion of biased juror who would automatically vote for the death penalty | Direct Appeal |
| **Claim 7(C):** Inclusion of biased juror who would not consider mitigation evidence | Direct Appeal |

| | |
|---|---|
| **Claim 7(D):** Ineffective assistance of trial counsel during voir dire | Direct Appeal |
| **Claim 8:** Denial of substitution of counsel prior to trial | 3rd state petition |
| **Claim 9:** Denial of motion to continue trial | 3rd state petition |
| **Claim 10(A):** Introduction of inadmissible hearsay from lay witnesses | Direct Appeal |
| **Claim 10(B):** Introduction of inadmissible hearsay from Dr. Green | Direct Appeal |
| **Claim 11(A):** Use of "Equal and Exact Justice" instruction | 3rd state petition |
| **Claim 11(B):** Use of "Reasonable Doubt" instruction in guilt and penalty phases | 3rd state petition |
| **Claim 11(C):** Use of "Anti-Sympathy" instruction | Direct Appeal |
| **Claim 11(D):** "Deterrence" instruction not given | Direct Appeal |
| **Claim 11(E):** "Clemency" instruction not given | 3rd state petition |

| **Claim 12(A):** Jury was not required to unanimously find aggravating circumstances | 3rd state petition |
|---|---|
| **Claim 12(B):** Jury was not required to unanimously find mitigating circumstances | 3rd state petition |
| **Claim 13:** Jury was not instructed it must find elements of death penalty beyond a reasonable doubt | 2nd state petition |
| **Claim 14(A):** Prosecutorial misconduct during closing arguments in guilt and penalty phase | Direct Appeal |
| **Claim 14(B):** Prosecutorial misconduct during witness examination in penalty phase | Direct Appeal |
| **Claim 15:** Introduction of inadmissible, undercharged prior bad acts into evidence | Direct Appeal |
| **Claim 16:** Refusal to allow evidence of drug abuse and intoxication as mitigating circumstance | 3rd state petition |
| **Claim 17:** Introduction of victim impact evidence | 3rd state petition |

| | |
|---|---|
| **Claim 18:** Creation of prejudicial atmosphere by victim groups | 1st state petition |
| **Claim 19:** Lack of public proceedings | 3rd state petition |
| **Claim 20:** Ineffective assistance of appellate counsel | 1st state petition |
| **Claim 21:** Nevada Supreme Court's failure to conduct fair and impartial appellate review | 4th state petition |
| **Claim 22:** Lack of due process because Nevada judges' tenure is not dependent on elections rather than on good behavior | 4th state petition |
| **Claim 23(A):** Nevada's statutory scheme does not narrow the death penalty class | 2nd state petition |
| **Claim 23(B):** Nevada's case law does not narrow the death penalty class | 2nd state petition |
| **Claim 23(C):** Harmless error analysis to juries' consideration of invalid aggravating factors | 2nd state petition |
| **Claim 23(D):** Expansion of aggravating factors renders Nevada's death penalty scheme arbitrary | 2nd state petition |

| | |
|---|---|
| **Claim 24:** Death penalty is cruel and unusual | 3rd state petition |
| **Claim 25(A):** Death by lethal injection is cruel and unusual | 4th state petition |
| **Claim 25(B):** Nevada's execution protocol is cruel and unusual | 4th state petition |
| **Claim 26:** Cumulative error, see all other claims | 4th state petition |
| **Claim 27:** Ineffective assistance of state post-conviction counsel | 3rd state petition |

CALLAHAN, Circuit Judge, concurring in part[1] and dissenting in part:

Because the opinion is contrary to the controlling Supreme Court opinions, I dissent from its misguided assertion that Hogan's failure to allege ineffective assistance of trial counsel until his third state post-conviction relief ("PCR") petition may be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012). *Martinez* created a narrow exception to the general rule that there is "no right to counsel in a state collateral proceedings." *Coleman v. Thompson*, 501 U.S. 722, 755 (1991). Based on "the importance of the right to the effective assistance of trial counsel," *Davila v. Davis*, 582 U.S. 521, 531 (2017), *Martinez* allows, under certain narrow circumstances, a defendant to raise a claim of trial counsel ineffective assistance of counsel ("IAC") in a second state PCR petition when it was not raised in the initial PCR petition due to the IAC of counsel in that proceeding. But here, Hogan did not raise trial counsel IAC in his second PCR petition. Rather, the issue was not raised until he filed subsequent post-conviction petitions in 2004 and 2008.

---

[1] I concur in the affirmance of the denial of Hogan's claim that his trial counsel provided ineffective assistance of counsel by failing to adequately investigate and challenge his 1971 Iowa manslaughter conviction (Claim 2(H)). I also concur in the affirmance of the denial of a Certificate of Appealability on Hogan's claims that (1) the trial court violated his confrontation right (Claim 10); (2) jury instructions prevented the jury from crediting mitigation evidence and providing Hogan with an individualized sentencing determination (Claims 11(C) and (D)); and (3) Nevada's lethal injection procedures violate the Eight Amendment (Claim 25). In addition, although I might not have granted a Certificate of Appealability on Hogan's challenges to the aggravating circumstances (Claims 5(A) and (B)), I agree with the denial of relief on those challenges.

Accordingly, the "cause" for procedural default was not IAC of counsel in Hogan's 1987 first PCR petition, but the failure to raise trial counsel IAC in his second PCR petition. Because the *Martinez* exception does not cover Hogan's case, or any case, where trial counsel IAC is not raised until a third or subsequent state PCR petition, I respectfully dissent.

**A**

Initially the majority tracks the controlling law.  It recognizes that there is no constitutional right to counsel in state post-conviction proceedings, Op. at 39, but that the Supreme Court in *Martinez* and *Davila* held that "when a state relegates trial-counsel IAC claims to state PCR proceedings, a claim of ineffective state PCR counsel is akin to a claim of ineffective direct-appeal counsel."  Op. at 39. It recognizes that the exception is "narrow" and that "'attorney error where there is no right to counsel,' such as in other state PCR proceedings, 'remains insufficient to show cause.'"  Op. at 39-40 (quoting *Shinn v. Ramirez*, 596 U.S. 366, 380 (2022)).  It even recognizes that for the *Martinez* exception to apply, the state collateral review proceeding must be the initial review proceeding in respect to the IAC of trial counsel claim.  Op. at 41 (citing *Trevino v. Thaler*, 569 U.S. 413, 423 (2013)).

But the majority goes off the track and fails to follow the authorities it cites when it disagrees with the district court determination "that Hogan's failure to raise the trial IAC claims in his second petition means that any ineffectiveness of his initial review PCR counsel cannot constitute 'cause' for the procedural default." Op. at 42.  The district court was right and properly applied Supreme Court precedent.  No discussion of the meaning of "cause," Op. at 42-45, or the

"procedural perplexities in this case," Op. at 46, or extensive guidance on remand, Op. at 49-53, can overcome the fact that Hogan in failing to raise a claim of trial counsel IAC in his second PCR petition (having failed to raise the claim of trial counsel IAC in his initial PCR petition) no longer qualifies for the *Martinez* exception to excuse his procedural default.

## B

The majority seeks to excuse Hogan's failure to raise trial counsel IAC in his second PCR on the ground that the Nevada "does not recognize the *Martinez* exception under state law*."* Op. at 45 (citing *Brown v. McDaniel*, 331 P.3d 867, 869 (Nev. 2014)).  The majority suggests that because trial counsel IAC was not raised in the first state PCR petition, Hogan was "precluded" from raising trial counsel IAC in a second PCR petition and thus counsel on his second PCR petition could not have been ineffective in not doing so. Op. at 46 n.10.

I disagree.  First, *Brown* does not establish an absolute bar.  Yes, the Nevada Supreme Court declined to accept the "equitable exception" noted in *Martinez*. 331 P3d at 870-71 ("The Supreme Court, however, expressly declined in *Martinez* to decide whether a federal constitutional right to counsel exists in post-conviction proceedings and instead emphasized that its ruling was equitable in nature rather than constitutional.") .  But it concluded that Brown's "petition was barred as untimely and successive *and that he did not demonstrate good cause and prejudice to overcome the procedural bars*."  *Id*. at 875 (emphasis added).  It further held that Brown had not shown a "fundamental miscarriage of justice."  *Id*.  Moreover, despite *Brown*, the Nevada Supreme Court continues to consider claims of IAC of trial

counsel on a first PCR petition when raised in successive PCR petitions. *See Taylor v. Warden NDOC*, 548 P.3d 776 (Table) (Nev. 2024) (noting "even were we to reconsider *Brown*, Taylor would not be entitled to relief").

Indeed, the Nevada Supreme Court considered Hogan's subsequent PCR petitions alleging trial counsel IAC. Hogan raised trial counsel IAC in a third PCR petition in 2004, and a fourth PCR petition in 2008. In its order denying Hogan's fourth PCR petition, the Nevada Supreme Court considered his claim of trial counsel IAC and concluded "that Hogan failed to demonstrate good cause to excuse the procedural bars." *Hogan v. State*, 128 Nev. 903. 381 P.3d 621 (Table), 2012 WL 204641 at *2 (Nev. 2012). It further noted that Hogan had not shown "a fundamental miscarriage of justice." *Id.* at *3. Accordingly, the failure to raise trial counsel IAC in the second PCR petition cannot be excused as being barred by *Brown* and cannot somehow justify the extension of the *Martinez* exception to cover trial counsel IAC claims asserted in Hogan's third and fourth state PCR petitions.

Hogan has not shown that if he had raised his trial counsel IAC claim in his second PCR petition, the Nevada courts would not have considered the claim. But even if Hogan had been truly barred from raising trial counsel IAC in a second PCR, he still would have had to assert trial counsel IAC in his second state PCR petition in order to qualify for the *Martinez* exception. *Martinez* is an equitable exception to the procedural default bar. The filing of a second state PCR petition shows that petitioner offered the state courts an opportunity to address the underlying constitutional issue. The fact that the state courts denied relief or declined to consider the alleged constitutional issue is essentially the predicate for seeking relief in a federal

court.  *See Coleman*, 501 U.S at 731 ("a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims.").

## C

The conclusion that Hogan no longer qualifies for the *Martinez* exception is compelled by Supreme Court precedent.  In *Martinez*, the Court explained its creation of an exception for establishing cause to excuse procedural default:

> *Coleman v. Thompson*, *supra*, left open, and the Court of Appeals in this case addressed, a question of constitutional law: whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial.  These proceedings can be called, for purposes of this opinion, "initial-review collateral proceedings." *Coleman* had suggested, though without holding, that the Constitution may require States to provide counsel in initial-review collateral proceedings because "in [these] cases . . . state collateral review is the first place a prisoner can present a challenge to his conviction." *Id.*, at 755.  As *Coleman* noted, this makes the initial-review collateral proceeding a prisoner's "one and only appeal" as to an ineffective-assistance claim, *id.*, at 756, and this may justify an exception to the constitutional rule that there is no right to counsel in collateral proceedings, see *id.*,

at 755; *Douglas v. California*, 372 U.S. 353, 357 (1963) (holding States must appoint counsel on a prisoner's first appeal).

566 U.S. at 9 (parallel citations omitted). However, the Court declined "to resolve whether that exception exists as a constitutional matter." *Id*. Instead, the Court held:

> To protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel, it is necessary to modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default. This opinion qualifies *Coleman* by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.

566 U.S. at 9.

Then, in *Davila*, the Court held that *Martinez*'s narrow exception "treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim—ineffective assistance of trial counsel—in a single context—where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal." 582 U.S. at 524-25. *Davila* explained that *Martinez*'s limited equitable exception "'reflect[ed] the importance of the right to the effective assistance of *trial* counsel,' which is 'a bedrock

principle in our justice system.'"  *Id*. at 531 (quoting *Martinez*, 566 U.S. at 12).  "The Court in *Martinez* also was responding to an equitable consideration that is unique to claims of ineffective assistance of trial counsel and accordingly inapplicable to claims of ineffective assistance of appellate counsel."  *Id.* at 534.  Accordingly, "*Martinez* provides no support for extending its narrow exception to new categories of procedurally defaulted claims," because "*Martinez* did not purport to displace *Coleman* as the general rule governing procedural default."  *Id*. at 529-30.

Thus, the *Martinez* exception provides a "gateway" for reviewing claims of trial counsel IAC that would otherwise escape consideration due to IAC of the petitioner's attorney on his *initial* postconviction petition (because for a claim of trial counsel IAC, such a petition is the equivalent of a direct appeal from the conviction).  But the gateway is narrow and of limited duration.  If the petitioner fails to raise trial counsel IAC in his second PCR petition—his first opportunity to do so in light of the alleged IAC of counsel in his first PCR petition—the gateway closes because the "cause" for petitioner's failure to adequately raise the claims is no longer the ineffectiveness of counsel in the first PCR petition, but attorney error in the second and subsequent state post-conviction petitions, which does not excuse the procedural default.

This conclusion is compelled by *Coleman* and *Davila*, which explains:

> Federal habeas courts reviewing convictions from state courts will not consider claims that a state court refused to hear based on an adequate and independent state procedural ground.  A state prisoner may be able to

overcome this bar, however, if he can establish "cause" to excuse the procedural default and demonstrate that he suffered actual prejudice from the alleged error. An attorney error does not qualify as "cause" to excuse a procedural default unless the error amounted to constitutionally ineffective assistance of counsel. Because a prisoner does not have a constitutional right to counsel in state postconviction proceedings, ineffective assistance in those proceedings does not qualify as cause to excuse a procedural default.

582 U.S. at 524 (citing *Coleman*, 501 U.S. 722). The Court noted that "[i]t has long been the rule that attorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel." *Id*. at 528; *see also Shinn*, 596 U.S. at 386 ("[W]e have repeatedly reaffirmed that there is no constitutional right to counsel in state postconviction proceedings."). It follows, "that in proceedings for which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot provide cause to excuse a default." *Id*. at 528-29. Accordingly, the Court declined to extend *Martinez* "to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim." *Id.* at 529.

The Supreme Court further cautioned that "[e]xtending *Martinez* to defaulted claims of ineffective assistance of appellate counsel would be especially troublesome because

those claims could serve as the gateway to federal review of a host of trial errors, while *Martinez* covers only one trial error (ineffective assistance of trial counsel)." *Id*. at 535. Such an expansion "would not only impose significant costs on the federal courts but would also aggravate the harm to federalism that federal habeas review necessarily causes." *Id*. at 537.

## D

The majority's reading of *Martinez* is the realization of the fears expressed in *Davila*. By extending *Martinez* to possibly allow federal courts to consider claims of trial counsel IAC that were not raised in either the first or second state PCR petitions, the majority excuses Hogan (and his attorneys) for not raising claims of trial IAC for decades and directing the district court in 2025 to determine in the first instance (because the merits have never been considered by the state courts) whether, in 1985, trial counsel was constitutionally ineffective. Are any of the participants in the trial, other than Hogan, still alive?

As reaffirmed in *Davila*, *Martinez* provides a narrow exception for claims of trial counsel IAC that were not raised in the "initial-review collateral proceedings" because of ineffective assistance of appellate counsel in that proceeding. Here, however, the "cause" for Hogan's procedural default was not counsel's ineffectiveness in Hogan's 1987 first PCR petition. Rather, the default was "caused" by Hogan's failure to challenge the alleged attorney error in his first PCR petition in his 1990 second PCR petition. Thus, the Nevada Supreme Court's determination that the trial counsel IAC claims raised in Hogan's third and fourth PCR petitions were defaulted turned on the ineffectiveness of counsel in Hogan's second

PCR petition—for which there is no constitutional right to counsel—not in the alleged IAC of counsel on his first state PCR petition (which is the extent of *Martinez*'s limited exception). *See Davila*, 582 U.S. at 524.

While *Martinez* may have been motivated by a concern "to ensure that meritorious claims of trial error receive review by at least one state or federal court," Op. at 40 (quoting *Davila*, 583 U.S. at 532), this concern does not warrant broadening its exception. This concern, even if it is a right, can be lost or forfeited just like most rights. Here, Hogan lost access to the *Martinez* gateway for showing cause to excuse procedural default when, after not raising trial counsel IAC in his 1987 initial PCR petition, he failed to raise trial counsel IAC in his 1990 second PCR petition.

## E

The narrow exception set forth in *Martinez* only excuses a procedural default based on the alleged IAC of post-conviction counsel in a defendant's *initial* state PCR proceeding. The *Martinez* exception to *Coleman*'s general rule that "a prisoner does not have a constitutional right to counsel in state postconviction proceedings," *Davila*, 582 U.S. at 525, does not cover Hogan's case—or any case— where trial counsel IAC is not raised until a third or subsequent state PCR proceeding. As the majority's determination that Hogan's procedurally defaulted claims of trial counsel IAC might qualify for the *Martinez* exception is contrary to the Supreme Court precedent, I respectfully dissent.